486 So.2d 1101 (1986)
STATE of Louisiana, Appellee,
v.
George Don McGUFFEY, Appellant.
No. 17663-KA.
Court of Appeal of Louisiana, Second Circuit.
April 2, 1986.
M. Randal Fish, Chief Indigent Defender, Benton, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Henry N. Brown, Jr., Dist. Atty., *1102 James M. Bullers, Asst. Dist. Atty., Benton, for appellee.
Before HALL, SEXTON and LINDSAY, JJ.
SEXTON, Judge.
The defendant, George Don McGuffey, was convicted by a jury of the crime of first degree murder of Earline Crabtree. In accordance with the recommendation of the jury, he was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. He now appeals, arguing for reversal of his conviction on the basis of two assigned errors. Finding no merit in either of these contentions, we affirm the conviction.

Context Facts
Because defendant's assignment of error number 2 challenges the sufficiency of the evidence under the standards of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and since a significant portion of the evidence is circumstantial, we find it necessary to discuss the facts of this cause in some detail.

Evening of the Homicide
On the evening of November 8, 1984, the defendant, his wife, Della, the victim, Earline Crabtree, her husband, Charles Crabtree, Sr., and her son, Charlie Crabtree, Jr. "Little Charlie," were all gathered at My Place, a local lounge owned by the Crabtrees. Also there were the defendant's aunt and uncle, Betty and Henry Stanfield, Betty Temple, and Howard Haynes, who was working at My Place on that night.
After an evening of drinking, the defendant, his wife and Little Charlie left My Place in a black Chevrolet Luv truck at approximately 1:30 a.m. The truck belonged to Marvin Wager, the McGuffeys' landlord, but was being used by the defendant and his wife. According to Little Charlie's testimony, upon arrival at the defendant's house, McGuffey stated that he was going to get more beer and left in the black Chevrolet truck.
Little Charlie testified that after defendant left the house, he and Della McGuffey smoked a marijuana cigarette and talked until after 2:30 a.m. They did not leave the house. Little Charlie stated that he fell asleep on one couch, while Della slept on another. Little Charlie stated that they remained there until McGuffey returned around 5:00 a.m. Little Charlie testified that he went outside and saw defendant exit the black truck. At that time, McGuffey, his wife, and Little Charlie left to go to Arkansas. Although Little Charlie had considered going with the McGuffeys to Arkansas, he later decided not to accompany them. He was dropped off at a house near his parents' home. According to his testimony, he walked home, deposited his belongings in a shed and walked down to have coffee with a neighbor. He further stated that he recalled that it was dark when they left the McGuffey house and that he did not notice anything unusual about the truck, the defendant or his clothes.
George Don McGuffey returned to the lounge after dropping his wife and Charlie Crabtree off at the McGuffey home. Betty Stanfield, Henry Stanfield and Howard Haynes testified that they saw the defendant return around 2:00 a.m. Howard Haynes recalled that he sold defendant two six-packs of beer which defendant paid for with a $10 bill. Betty Stanfield said she saw the defendant walk around the back of the lounge and then return with two bags of beer. He gave one beer to Betty and the rest of the six-pack to Betty's husband. According to her testimony, when she left the bar she saw the defendant driving the black truck on the Rocky Mount Road at the railroad tracks around 2:00 a.m., near the same place where the Crabtree's blue pickup truck would be found the next day. She stated that she saw no one in the truck with him.
Jesse Mathis, defendant's mother, testified that her house is located near the defendant's house and My Place Lounge. She said she saw the defendant drive by in the truck at approximately 3:15 a.m. and *1103 then come back past her house at approximately 3:20 a.m.
Betty Temple testified that she talked to the victim at the bar, then observed the victim going up to her driveway around 2:30 a.m. She said the victim pulled in, pulled back out, and went towards Plain Dealing. Mrs. Temple stayed at the bar until 3:00 a.m. and did not see the victim pass by the lounge again.
Betty Stanfield testified that at some point in the evening Charlie Crabtree, Sr., the victim's husband, told her that he was drunk and he was going to go to the parking lot to sleep in his car for a while. Mrs. Stanfield was not asked specifically at what time Charlie, Sr. left but she testified that it was "before it got late." She also stated that "before closing time" she went out to the parking lot and walked by Charlie Crabtree Sr.'s vehicle and did not see him in it. However, James Frazier, a deputy with the Bossier Parish Sheriff's Office, saw Charlie, Sr. lying down in the front seat of his car asleep around 2:30 or 3:00 a.m. Deputy Frazier observed Charlie, Sr. leaving the bar about five minutes later and turn down the driveway going into his residence.
The next morning, Friday, November 9th, the defendant and Della arrived in Gurden, Arkansas a little after 7:00 a.m. Rose Lee, Della's mother, saw them in the black truck approximately two or three blocks from her house in Gurden. The next time Mrs. Lee saw the couple was shortly before lunch when they came to the place where she worked. Mr. McGuffey gave Rose Lee a $100 bill to enable her to pay a bill for him.
Notwithstanding the testimony of Della's mother, Derelda Joyce Davis and Betty Temple both testified that on Friday, November 9th at approximately 10:00 a.m. they saw Della McGuffey in the black truck pulling out of the road across from My Place Lounge. They stated that she sounded the horn and waved at them.

The Investigation
On the morning of November 9, 1984, in response to a missing person's report, Deputy Dale Barnett of the Bossier Sheriff's Office went to the Hunting Club Road, a rural road located off the Rocky Mount Road, south of Plain Dealing and east of Highway 3. There, Deputy Barnett saw a blue and white 1970 model Ford pickup truck belonging to the Crabtrees which Earline had been driving the night before. Charlie Crabtree, Sr. and Little Charlie were with the truck. They had been searching for Earline who had not come home the night before. After the arrival of two more detectives, the scene was inspected, but no evidence of foul play was disclosed.
On November 11, 1984, Richard Gray, age 15, and Grant Gray, age 13, were looking for a place to hunt around Hardcastle Pond located off of Highway 2, east of Plain Dealing near the Firetower Road. One of the boys thought he saw a deer in the water, but on closer inspection discerned that it was a body.
The Bossier Parish Sheriff's Office was contacted and Deputy Tommy Ferqueron, among others, went to Hardcastle Pond. When he saw the body, he recognized it as Earline Crabtree. Deputy Ferqueron inspected the area around the pond and found a set of black jumper cables across a clearing in the woods approximately fifteen feet from the edge of the pond from where the body was found. A black vinyl-type wallet was found under water southeast of the body. A checking account card, a photo, and various other documents were located scattered on the bank of the pond near the body. Marvin Wager later identified the black jumper cables as belonging to him. He recognized them because they were burned on one end. He stated that the cables had previously been at the rent house where the defendant and Della were staying.
On November 12th, Hardcastle Pond was dredged. A blouse, a pair of pants, and underwear were recovered and were subsequently determined to belong to the victim. The pants were blue knit, the underwear *1104 was bloody, and the blouse was white with black stripes and floral designs. No useable footprints were found at the scene.
Deputy Tommy Ferqueron headed the Earline Crabtree homicide investigation. On November 12, 1984, he saw the defendant and his wife at the Plain Dealing City Hall. Deputy Ferqueron received permission from Marvin Wager, the owner of the black truck parked at City Hall, to search the truck. The truck was then sent to the Northwest Crime Lab to be inspected and tested by experts.
The investigators later went to McGuffeys' house where the defendant's wife gave them a folding knife which she had in her purse. The knife which had come from Della's purse was later shown to Dr. George McCormick, II, the coroner of Caddo Parish, by the counsel for the state. Dr. McCormick testified that it could have possibly been the knife that inflicted some of the wounds that the victim suffered. However, he could not say that it was the exact knife used by the assailant, but only that it had the configuration to cause the wound to the victim's vagina and to the other areas which suffered scraping and cuts.
In connection with the investigation, Detective Lamar Breedlove and Chief Deputy Larry Deen of the Bossier Sheriff's Department took a statement from the defendant on or about November 12, 1984. Detective Breedlove and Chief Deputy Deen also took a recorded statement from the defendant on that same date.
According to Breedlove's testimony, the defendant stated that he left the bar somewhere around 1:30 or 1:45 a.m. to take his wife Della and Little Charlie to his residence. He returned to the bar somewhere around 2:00 a.m. when they were closing and made an attempt to purchase beer. The officer testified that according to Mr. McGuffey, he was unable to purchase beer at My Place. He therefore traveled to Plain Dealing to another convenience store. McGuffey then told the officers that he went to a location called Miller's Bluff to see an individual about conducting a drug transaction where he stayed approximately two to two and one-half hours. McGuffey would not reveal the identity of the individual he met at Miller's Bluff to the officers. The defendant told them that after he left Miller's Bluff, he went back to his residence and picked up his wife and Little Charlie somewhere around 5:00 a.m. They dropped Little Charlie off near his residence and then drove to Gurden, Arkansas.
Later on November 12th, Deputy Ferqueron and another deputy were transporting Mr. McGuffey to the Northwest Crime Lab in Shreveport. The defendant initiated a conversation with them and told them that he had relatives in Porterville between Sarepta and Springhill that could tell them where he had been in the early morning hours of November 9, 1984. However, defendant would not disclose the identity of the person or persons in Porterville that could substantiate his alibi. The defendant also told these deputies that he left the bar at approximately 1:30, took Della and Little Charlie to his house, returned to My Place to make the purchase, was unable to buy beer, got on Highway 3 traveling north back towards Plain Dealing, went by his mother's residence and then traveled out to Miller's Bluff. He stated that he stayed in that area from the time the bar closed until around 4:00 or 4:30 a.m.
On the morning of November 16, 1984, Della McGuffey, Deputy Ferqueron and Deputy Barnett traveled north on Highway 3 from the Plain Dealing area toward Arkansas retracing the route taken by defendant and Della on the morning of the crime. During this trip, Della directed the deputies to a pillowcase with a floral design, which they found six and one-half miles north of Plain Dealing on Highway 3. They also recovered a light blue button-up shirt just north of Emmet, Arkansas on Highway 67. Next they located what appeared to be temporary license tags on the right hand shoulder of Highway 51 in a grassy area west/northwest of Whelen Springs, Arkansas. Mr. Wager identified the torn up tags as the ones that had been behind the seat in the cab of his black *1105 Chevrolet truck the last time he had seen it. The trio traveled further north looking for jewelry and rings belonging to the victim; however, they were unsuccessful in retrieving these small items.
Further police investigation revealed that there was also an attempt made to establish an alibi for the defendant. Richard Sanders testified that the defendant and his wife came to his trailer at approximately 7:00 or 8:00 p.m. on November 8th. Della later came to Sanders' trailer on the evening of November 12, 1984 at about 6:00 or 7:00 p.m. to try to get Sanders to state that defendant had been at his house from 10:00 p.m. on November 8th until 5:00 a.m. November 9th. The testimony of Brian Roach, Sanders' roommate, confirmed that the McGuffeys had been at Sanders' trailer on November 8th at 7:00 or 8:00 p.m. and that Della had returned to Sanders' home on November 12th and talked with Sanders. Furthermore, Betty Stanfield testified that she had spoken with defendant while he was in jail and he told her that she, Howard Haynes, and Betty Temple should "go change your damned statements." He also told Betty that he did not remember going back to the bar, buying beer, or being on the Rocky Mount Road.
From Rachel Wright, the victim's daughter, investigators learned that her mother had a brown billfold in which she kept her credit cards and a black billfold in which she kept her money. The black billfold was found with the body and various other photos and documents. The brown billfold with the credit cards was never found and neither were some rings that her mother typically wore. Vadie Wise Robinson testified that she had cashed a check for the victim on Thursday, November 8th for $150. Paul Steward testified that he gave Earline rent money in the amount of $50 and also $80 for her to hold for him on November 7th. None of this money was found on the victim, at the scene, or in the black wallet.

The Victim's Injuries
Dr. George McCormick, II, coroner of Caddo Parish, performed an autopsy on November 12th. In addition to a large incision across her face from the hairline across the jaw down to the collar bone, he noted extensive severe bruising of the chest, abdomen and right side of the pelvis. On the right side of the victim's labia the pubic hair had been shaved and the skin had been scraped away. In this area there was extensive swelling and bruising. Dr. McCormick testified that these injuries were inflicted while the victim was still alive. Dr. McCormick also noted various wounds which he described as defensive in nature as well as abrasions and scrapings on the lower back which he testified were consistent with the body having been dragged.
In addition to these injuries, the victim had a broken nose, facial fractures and facial bruises. Her chin was swollen and bruised as were her lips. She also had a fractured tooth. Dr. McCormick testified that the facial injuries could have resulted from a fist but would have required significant strength to inflict. He also found a hemorrhage at the back of the head and at the rear of the heart as well as numerous rib fractures. There was also significant hemorrhaging in her abdomen around the bladder and vagina. Dr. McCormick observed lacerations inside the vagina which were made with an instrument with either jagged edges or one that was inserted with great force. He stated these injuries could not have been received during intercourse. Dr. McCormick found no sperm present in the victim's vagina.
Dr. McCormick determined that the internal injuries including massive abdominal hemorrhage, brain contusion, and a crushed chest acted in concert to cause death. Dr. McCormick further determined that the crushing of the chest and the fracturing of the ribs most likely occurred while the subject was lying on the ground and in all probability being forcefully stomped with a foot.

*1106 The Physical Evidence

Pat Wojtkiewicz, an expert in forensic serology at the Northwest Louisiana Crime Lab, inspected the different articles including the truck brought to the Crime Lab and performed a series of tests upon these items. His inspection of the truck revealed that there were major blood stains in the truck on the passenger's side corner under the recessed portion of the seat. Blood was also found on the visor located on the passenger side, on the seat on the passenger's side, on the rubber seal of the door on the passenger's side, behind the seat, on the back floorboard in the matting, on the passenger's side door, and near the gearshift and central console. There were also a few splatters on the driver's side. Mr. Wojtkiewicz testified that it appeared from the areas where the blood was found that the blood had been wiped. The wiping process caused traces of the blood to collect in the crevices where Wojtkiewicz found them. Mr. Wojtkiewicz also examined the defendant's clothes, his boots, jeans and shirt, the victim's clothes including her bra, blouse, pants, and panties, the temporary license plates, the blouse found along the road, and the pillowcase which was found along the road. He then performed blood typing tests upon certain involved parties.
After completion of the examination of the items and after the typing of blood taken from the victim, the defendant and Della McGuffey, Mr. Wojtkiewicz concluded that the blood stain on the floor matting of the truck was of the same blood type as that of the victim. The serologist further concluded that the results of one test revealed that only two to three persons out of one hundred could have left the blood on the floor of the truck. Furthermore, neither the defendant nor his wife could have left the blood in the truck as their blood types were inconsistent with that of the stains. After running another series of tests, Mr. Wojtkiewicz concluded that the blood found on the floor matting was of a type that only six or seven persons out of one thousand could have left. Mr. Wojtkiewicz further concluded that the blood he found could not have been left by either of the McGuffeys and that the various factors in the blood he found eliminated 99.5 percent of the Caucasian population. In other words, only one-half of one percent of the Caucasian population could have left the blood found in the truck and the victim Earline Crabtree was among that group.
All of the blood that was tested from the truck, the license tags and the shirt found on the roadside was consistent with the sample taken from the victim. The pillowcase was also inspected to determine the origin of its blood stains. Mr. Wojtkiewicz could not properly type this blood because it had been diluted, possibly with water. He noted that this circumstance was consistent with the pillowcase being used to wipe down the interior of the truck.
Examination of the clothes surrendered by defendant failed to disclose the presence of blood. However, the clothes were admittedly laundered in Gurden, Arkansas. Furthermore, the serology expert testified that washing the clothes shortly after exposure to blood could leave them free from any stain. The interior of the truck was examined for hairs and those that were found could not have come from Earline. Wojtkiewicz testified that some of the hairs had microscopic characteristics consistent with McGuffey's hair type. Soil tests were inconclusive.

Assignment of Error No. 1
The defendant claims that the trial court erred in failing to grant a mistrial following a police officer's reference to inadmissible other crimes evidence during the trial. Defendant claims that this reference was prohibited by LSA-C.Cr.P. Art. 770(2) and thus mistrial was mandated.
The remark arose within the following context. Detective Breedlove was being questioned by the prosecutor regarding an oral statement made by the defendant to Detective Breedlove and another officer. In response to a question, the police officer stated "... Mr. McGuffey stated that he *1107 went out to the Miller Bluff area to see an individual. We talked to him about why he went to the Miller Bluff area and he said to conduct a drug transaction." At this point, the defense attorney objected and moved for a mistrial. The jury was then retired. The motion was denied, and when the jury returned, the judge gave an admonition to disregard the response.
A direct or indirect reference to a crime committed or alleged to have been committed by a defendant, as to which evidence would be inadmissible and made within the hearing of the jury by the judge, district attorney, or a court official, during trial or in argument requires a mistrial on motion of the defendant. LSA-C.Cr.P. Art. 770(2). A police officer is not a "court official" for the purposes of LSA-C.Cr.P. Art. 770. State v. Carter, 412 So.2d 540 (La.1982); State v. Pettaway, 450 So.2d 1345 (La.App.2d Cir.1984), writ denied 456 So.2d 171 (1984). Therefore, in this instance the decision on the motion for mistrial was governed instead by LSA-C.Cr.P. Art. 771, which does not require a mistrial unless the remark was solicited by the prosecutor or a mistrial was necessary to assure a fair trial.
Art. 771 leaves the decision as to whether to grant a mistrial or to admonish the jury to avoid the prejudicial testimony to the sound discretion of the trial court. State v. Smith, 418 So.2d 515 (La.1982); State v. Goods, 403 So.2d 1205 (La.1981); State v. Douglas, 389 So.2d 1263 (La.1980). A trial judge should grant a mistrial only where the prejudicial remarks result in substantial prejudice to the defendant and make it impossible for him to obtain a fair trial. State v. Burdgess, 434 So.2d 1062 (La.1983); State v. Johnson, 440 So.2d 838 (La.App.2d Cir.1983). The trial judge, instead of granting a mistrial, may admonish the jury when he believes that an admonition is sufficient to assure defendant a fair trial. State v. Michel, 422 So.2d 1115 (La. 1982). Moreover, a mistrial is a drastic remedy which is only authorized where such substantial prejudice would otherwise result to the accused. State v. Smith, supra; State v. Johnson, supra.
The purpose behind excluding other crimes evidence is to insure that the defendant will not be presumed to be guilty of the instant crime because of past offenses. In the absence of clear prejudice, a witness' unsolicited reference to other crimes by the accused warrants only an admonition that the jury disregard the objection or remark. However, a prejudicial remark by an experienced police officer should be viewed with considerable concern as to the fairness of the trial and it may require granting a mistrial, especially if the remark was precipitated by or should have been anticipated by the district attorney. Nevertheless, the decision as to the necessity of granting a mistrial or the circumstances is left to the sound discretion of the trial court. State v. Goods, supra; State v. Odds, 430 So.2d 1269 (La.App. 1st Cir. 1983). Although the Supreme Court has held that a police officer's unsolicited, unresponsive reference to another crime alleged to have been committed by a defendant is not the comment of a court official under LSA-C.Cr.P. Art. 770(2), such an officer will be held to the same standard if his answers show a pattern of unresponsiveness or improper intent. State v. Nuccio, 454 So.2d 93 (La.1984); State v. Harris, 383 So.2d 1 (La.1980); State v. Schwartz, 354 So.2d 1332 (La.1978).
In this instance the defendant asserts that the reference to the alleged drug transaction was so prejudicial that he was denied a fair trial and that the judge's admonition to the jury to disregard the comment was insufficient to protect that right. Specifically, he claims that Detective Breedlove blatantly made the reference to other crimes evidence purely to prejudice the defendant after Detective Breedlove, the prosecuting attorney, defense counsel and the judge met to excise references to other crimes contained in defendant's taped statement. McGuffey further asserts that the remark was precipitated by the prosecution's question.
*1108 Detective Breedlove did attend a meeting with the attorneys and the judge in which the recorded statement was edited to delete evidence of other crimes. However, the three incidents discussed in chambers were a prior burglary conviction, a charge of possession of a firearm by a convicted felon, and a reference that the defendant made himself about assaults involving the shaving of women. There was no evidence that during the conference that this specific incidence was emphasized as inadmissible to the officer before his testimony.
Also it should be noted that the response followed the state's second inquiry on the issue of the defendant's contention that he went to Miller's Bluff. The first inquiry had been interrupted by a defense objection on another point which precipitated what appears to be a sharp argument between counsel. Thus the circumstances surrounding Detective Breedlove's response appear confusing and give credence to the fact that it was unresponsive and not solicited by the state.
The trial court obviously concluded that the state did not intentionally seek to prejudice the defendant and that an admonition was sufficient to cure any possible prejudice. We cannot say that this action was not within the realm of the trial judge's great discretion.
Moreover, we note that in State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984), the Louisiana Supreme Court stated that an exception to Art. 770 requiring a mistrial if a court official improperly comments on other crimes is made if the evidence is substantially relevant to some purpose other than to show that the accused is a bad person, therefore, more likely to have committed the crime. The underlying policy protecting the accused against unfair prejudice dictates that, even though the evidence had an independent relevance, the trial judge must balance all the pertinent factors to determine whether the probative value of the evidence is outweighed by its prejudicial effect. In Kirkpatrick, the defendant's arrest for arson was extremely relevant to show the defendant's connexity with the stolen property of the victim so as to establish proof of robbery. Because of the importance of the evidence, the Court found that the prejudicial effect of the mention of the defendant's arrest was outweighed by its relevancy to the robbery of the victim.
In the case sub judice, defense counsel stated in his opening statement that he expected to show that defendant was asleep at home from 3:30 to 5:00 a.m., leaving the black truck available for someone else's use during that time. The defendant also served pre-trial notice of his intent to use an alibi. Here, the state was apparently eliciting the testimony regarding defendant's statement concerning his whereabouts to counter the anticipated testimony that defendant was at home asleep. It is ironic that in the question to Detective Breedlove which provoked the answer that is the subject of this assignment, the state sought to prove not that defendant was conducting a drug transaction but that he was elsewhere committing a murder. Thus, while it does not appear that the officer's answer was responsive to the question asked, or that the state sought the answer regarding the drug transaction, the prejudicial effect of this remark, if any, seems outweighed by its relevancy. This assignment lacks merit.

Assignment of Error No. 2
In this assignment, defendant contends that the evidence adduced at his trial was legally insufficient to sustain his conviction for first degree murder. Specifically, he argues that the state's evidence did not exclude the reasonable possibility that someone else murdered the victim while in the black Chevrolet truck which McGuffey was using.
Recently, this court reiterated the proper appellate review standard for sufficiency of evidence claims in State v. McFadden, 476 So.2d 413 (La.App.2d Cir.1985), as follows:
Circumstantial evidence is not inherently less reliable than direct evidence. Holland v. United States, 348 U.S. 121, *1109 75 S.Ct. 127, 99 L.Ed. 150 (1954); CCrP Art. 798(3); State v. Chism, 436 So.2d 464 (La.1983). Any man would accept dog tracks in the mud against the sworn testimony of a hundred eyewitnesses that no dog passed by. The gist and the key to circumstantial evidence is the inference or process of reasoning by which the conclusion is reached. Chism, supra, at p. 469.
LRS 15:438 is an evidentiary guide for the jury and a tool or methodology for the reviewing court to employ in determining whether the rational juror in the Jackson v. Virginia constitutional due process test might have concluded that defendant's alternative hypothesis of innocence is sufficiently unreasonable to conclude that the evidence proved guilt beyond a reasonable doubt. State v. Chism, supra; State v. Wright, 445 So.2d 1198 (La.1984); State v. Captville, 448 So.2d 676 (La.1984).
The test, whether expressed in terms of doubt or of hypothesis, is the reasonableness of the ultimate conclusion on the facts and inferences which may be drawn from those facts in the particular case. Compare State v. Shapiro, 431 So.2d 372 (La.1982), and State v. Rault, 445 So.2d 1203 (La.1984). In some cases, "the defendant's circumstantial theory [or hypothesis] is [found to be] remote [or unreasonable] ..." when it is compared "... with the prosecution's hypothesis of defendant's guilt, which is consistent overall with the evidence." State v. Graham, 422 So.2d 123, 130 (La.1982). [footnote omitted]
The defendant argues that a reasonable hypothesis has not been excluded by the evidence presented. He claims that the hypothesis that someone other than Mr. McGuffey drove the black Chevrolet truck on the night of the murder and committed the murder is reasonable. As possible suspects, the defense suggests that it was possible that Della McGuffey or Little Charlie killed Earline Crabtree. In support of this hypothesis, the defendant asserts that there was no evidence of blood on his clothing, his person, or in his home to connect him with the victim or the crime scene. He notes that the knife or weapon which was used during the offense was not identified as belonging to him. In fact, he argues that the exact weapon was never specifically identified. Furthermore, McGuffey argues that it is reasonable that Della was responsible for the murder, as two witnesses testified that they saw Della driving the black Chevrolet truck on the Friday morning after the offense. Moreover, he claims that it was Della who showed the police where the pillow case, license tags, and shirt were; therefore, it is highly likely that she was responsible for placing these items where they were found. Lastly, he claims that suspicion should also be focused on Della because it was she who sought an alibi for him without his requesting her to do so.
These hypotheses were presented to the jury and were not accepted by them. Furthermore, the jury assessed the defendant's credibility and found it lacking. We find that the jury's rejection of the defendant's arguments were reasonable in the light of the record evidence.
It was admitted by defendant that his clothes had been laundered in Gurden, Arkansas on Friday after the murder took place. Also, the testimony relating to Della's driving the black Chevrolet truck on Friday morning around Plain Dealing was contradicted by Della's mother's testimony to the effect that her daughter and the defendant were in Gurden, Arkansas by 7:00 Friday morning and that she later had lunch with them. Defendant's pre-trial statements to the police also corroborate this version of the events. As far as Della showing the detectives where the license tags, shirt and the pillow case were located, these actions lend further credence to the hypothesis that McGuffey murdered Earline Crabtree, picked up his wife, and drove to Arkansas where he or they discarded the evidence along the way.
Also noteworthy is the fact that the truck which George Don McGuffey was driving contained blood stains and splatters *1110 which enabled the expert serologist to sufficiently identify the blood as belonging to the same apparently rare blood group of Earline Crabtree. Thus, it was sufficiently proven that Earline was at least seriously injured while in the black Chevrolet truck. The testimony of Little Charlie to the effect that he and Della remained at the McGuffey household until defendant returned at approximately 5:00 a.m. driving the truck and the testimony of defendant's mother that she saw defendant driving the truck around 3:00 a.m. further support the jury's finding that defendant was indeed the person driving the truck. The testimony relating to defendant's return to My Place and being seen driving around in the black truck after 2:00 a.m. is additional support for the state's hypothesis of guilt. Furthermore, Rose Lee's testimony concerning the defendant giving her $100, the testimony concerning the amount of money Earline was carrying with her and the absence of money and rings on the body, support the jury's implicit finding that she was robbed prior to her death. Lastly, Della's actions in aiding the police to locate the evidence on the road to Gurden is consistent with the jury's verdict.
When the evidence is viewed as mandated by Jackson v. Virginia, supra, the defendant's hypothesis that someone else committed the murder is remote and unreasonable as compared with the prosecution's hypothesis of defendant's guilt. Therefore, the evidence was legally sufficient to sustain the defendant's conviction for the first degree murder of Earline Crabtree.
Having determined that neither of the assignments of error perfected by the defendant are meritorious, the conviction of George Don McGuffey is affirmed.
AFFIRMED.