837 So.2d 165 (2003)
STATE of Louisiana
v.
Corey PAGE.
No. 02-KA-689.
Court of Appeal of Louisiana, Fifth Circuit.
January 28, 2003.
Rehearing Denied February 24, 2003.
*168 Paul D. Connick, District Attorney, Alan D. Alario, II, Terry M. Boudreaux, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Jane L. Beebe, Gretna, LA, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and CLARENCE E. McMANUS.
SOL GOTHARD, Judge.
Defendant, Corey Page, was convicted of ten counts of armed robbery in violation of LSA-R.S. 14:69 and one count of second degree kidnapping in violation of LSA-R.S. 14:44.1.[1] Pursuant to a multiple offender bill of information, defendant was found to be a second felony offender on five of the underlying counts based on defendant's prior conviction for second degree battery. The trial court sentenced defendant to the following: 1) 150 years on *169 count one and 99 years each on counts two through five, all to run concurrently with each other but consecutive to all other counts; 2) 175 years on count six and 40 years on count eleven, to run concurrently with each other but consecutive to all other counts; 3) 160 years on count seven and 99 years on count eight, to run concurrently with each other but consecutive to all other counts; and, 4) 198 years each on counts nine and ten, to run consecutively with each other and all other counts. The sentence effectively totaled 881 years. All sentences were imposed without the benefit of parole, probation or suspension of sentence. Defendant now appeals his convictions and sentences.

FACTS
The eleven count bill of information can be categorized into four separate incidents.

THE INCIDENTS

1) Counts Six and Eleven

At approximately 2:00 a.m. on December 3, 1999, Walter Yrle was working at his computer repair shop, Computer Clinic, located on the Westbank Expressway, when the electricity went off. He packed up his laptop computer putting two deposit envelopes and the day's receipts inside and left the store. As he locked up the store, he noticed the lights were on in the shop next to his and suspected foul play. He walked straight to his car when a masked man came from the side of the building yelling, "Get down or I'll blow you away." Mr. Yrle testified the man approached in a crouched position like a policeman moving with a weapon. Something black was protruding from the man's left hand, which was covered with something red. Mr. Yrle stated the man was holding the item like a policeman would hold a gun. He believed the man was armed. Mr. Yrle could only see the man's eyes and not his face.
Mr. Yrle was made to lay spread eagle in the parking lot. The man put something in Mr. Yrle's back, told him not to move and took his car keys and laptop computer. The man then ordered Mr. Yrle into the trunk of the car. Mr. Yrle tried to resist but the man dragged him to the car, pushed him into the trunk and closed the trunk. Mr. Yrle testified the car stopped twice. At one point, the man asked Mr. Yrle for his ATM card but Mr. Yrle did not have one. At the third and last stop, Mr. Yrle heard the man rifling through the back seat. Mr. Yrle asked the man to leave his laptop to which the man agreed. The man then unlocked the trunk and told Mr. Yrle to count to 20 before opening the trunk. When Mr. Yrle got out of the trunk, he discovered he was on Downman Road in New Orleans East. Approximately $6,000 was missing from his laptop case, which included both deposit envelopes and the cash from the day's receipts.

2) Counts One through Five

Between 6:00 p.m. and 8:00 p.m. on December 30, 1999, Andrew Hungerford was working at his computer store, PC Direct, on Lapalco when two men masked with bandannas and armed with guns entered the store. The employees and customers were ordered to lie on the ground. One man approached Mr. Hungerford with a gun in his left hand and asked where the money was. Mr. Hungerford gave the man a tray of money containing between $300 $500. The man then made Mr. Hungerford walk to the back of the store where the man took Mr. Hungerford's wallet. Mr. Hungerford was forced to his knees and then put face down on the floor where his hands and feet were taped.
Two other people in the store, David Moreau and Willie Jordan, Sr., were also put face down on the floor at which time their hands were taped behind their backs and their feet were taped. One man put a *170 gun to the back of Mr. Moreau's neck and took his wallet which contained between $50 $75. One man put a gun to Mr. Jordan's chin and took his wallet and cell phone.
Van Dixon and his girlfriend were also in the store but they were not taped. One man put a gun to Mr. Dixon's neck and asked for money. Mr. Dixon gave the man $5 and the remote for his alarm.
Also present in the store at the time of the robbery were Mr. Hungerford's three minor nephews, ages 14 and 15. M.D.[2], one of the teenagers, was approached by one man with a gun and told to empty his pockets. He gave the man $5 and a food stamp from his wallet.
The two masked men left through the front door. The victims untaped each other and called the police.

3) Counts Seven and Eight

Sometime after 10:00 p.m. on December 31, 1999, Felicia Knight and Sherylyn Richardel were working at Domino's Pizza on Barataria. Ms. Knight explained that the "carry out" usually closes at 10:00 p.m. but was kept opened because of the surrounding activity associated with New Year's Eve. A man, later identified as the defendant, approached the door. Ms. Knight "buzzed" him in because she thought he had ordered a pizza. As defendant opened the door, a second man wearing a bandanna on his face, ran into the store. Defendant put a gun in her face and ordered her to open the safe. While Ms. Knight was complying, a customer entered the store. Ms. Knight was ordered to lie down on the floor while defendant told the customer the pizza was not ready and to come back later. Ms. Knight then opened the safe and defendant took the money, approximately $300.
Meanwhile, the man with the bandanna ran to the back of the store where Ms. Richardel was located. The man yelled, "down on the floor," at which time Ms. Richardel saw a gun. She was taken to the front of the store and made to lie face down. Ms. Richardel told the man she had money in her back left pocket, which he retrieved, along with her wallet in her right pocket.
The men then rifled through the office drawers before leaving the store through the back door. The men told Ms. Knight and Ms. Richardel to wait five to ten minutes before moving. Ms. Knight subsequently called the police on her cell phone.

4) Counts Nine and Ten

At approximately 10:30 p.m. on January 28, 2000, Peter and Gaynelle Hand returned to their home on Deerfield Road in Terrytown.[3] Mr. Hand went inside while Mrs. Hand remained outside for a few minutes to straighten the car. When Mrs. Hand entered the house, someone pushed her inside from behind. She made several attempts to run outside but the person kept dragging her back inside the house by her arm. Mr. Hand, a retired New Orleans policeman who was weak from receiving radiation treatment for lung cancer, began to fight with the perpetrator as Mrs. Hand continued her attempts to get out of the house. The perpetrator was wearing a ski mask and was armed with a gun.
Eventually, Mr. and Mrs. Hand stopped resisting and were made to kneel on the floor. Mr. Hand was bleeding from the *171 head where he was hit with the gun. The perpetrator took Mr. Hand's wallet, Mrs. Hand's purse and a pair of shoes that were in a Dillard's bag.
After the perpetrator left, Mr. Hand grabbed a gun and went outside. He did not see anything and called the police. A Rolex with diamonds and a broken face, later identified as belonging to defendant, was found on the floor of the Hands' home.

THE INVESTIGATION
Detective Scott Guillory investigated the armed robbery at PC Direct. He traced several calls made on the stolen cell phone after the robbery to Terrence Ellis. Detective Guillory interviewed Ellis who stated that he was picked up from work by defendant, Keenan Holmes, and Krystal Wilson on the night of December 30, 1999. Ellis testified that defendant and Holmes stated they had just robbed some people at a computer store. Ellis testified he did not see any money but stated defendant had a cell phone and Holmes had a gun and bandanna in the car.
Detective Guillory also interviewed Wilson, defendant's girlfriend at the time, whose statement was similar to Ellis' statement. Detective Guillory then obtained an arrest warrant for defendant and Holmes. Wilson also advised Detective Guillory that defendant told her of a robbery where he took $4,000 from a man, put him in the trunk and drove him to the east. Detective Guillory looked into the matter and discovered the incident had occurred on December 3, 1999. He interviewed the victim, Mr. Yrle, and subsequently obtained an arrest warrant for defendant on that incident. Wilson further advised Detective Guillory of the Domino's robbery but he directed her to Detective John Carroll who was investigating that robbery.
In his investigation of the Domino's pizza robbery, Detective Carroll obtained a description of one of the perpetrators from the victims. He learned defendant was a suspect in a series of similar robberies. Detective Carroll interviewed Wilson who advised she was present at the Domino's when it was robbed. She explained she, defendant and a person identified only as "Little Mike" went to Domino's for pizza. Wilson waited in the car while defendant and "Little Mike" went inside. She did not see what happened inside but was given money upon defendant's return to the car. Wilson stated defendant admitted robbing the Domino's the next day.
Detective Carroll prepared a photographic lineup containing defendant's photograph. He showed the lineup to Ms. Knight who positively identified defendant as the person who robbed the Domino's on December 31, 1999.
Detective Carroll also investigated the Hand robbery. He found a Rolex with diamonds at the scene of the Hand robbery and remembered Wilson stated defendant was in possession of two Rolex watches with diamonds. He showed the Rolex to Wilson who stated the watch belonged to defendant.
Defendant was arrested on February 8, 2000. The police went to defendant's home to execute the arrest warrant. Defendant was found lying next to an abandoned car in the backyard. He started to run but was caught and arrested. A gun was found in the grass within reaching distance where defendant was initially lying.
At trial, Keenan Holmes, a co-defendant in the PC Direct robbery, testified that he and defendant robbed people in a computer store. Holmes also stated defendant told him about a robbery defendant committed at another computer store where he kidnapped a man, stole money, put him in the trunk of the man's car and drove the man from the westbank to the eastbank. *172 Holmes further testified defendant told him about a robbery he committed at Domino's and another robbery he committed involving two old people where the man fought back.
Defendant testified in his defense. He denied he had ever been to the Computer Clinic or PC Direct. He denied going into Domino's pizza on the night of the robbery. He suggested Ms. Knight identified him as the perpetrator because she had seen his picture in the newspaper as a suspect in the pizza robbery. Defendant further suggested Ellis testified against him because Ellis had a grudge against him. He also stated Holmes and Wilson were coerced into testifying against him. Defendant explained the discovery of his Rolex at the Hand residence by stating it had been stolen prior to the robberies in question.

SUFFICIENCY OF EVIDENCE
In his second allegation of error, defendant specifically complains the evidence was insufficient on counts one through six and nine through eleven to prove his identity as the perpetrator of the crimes. Defendant asserts his identification on these counts was based only on the testimony of Keenan Holmes, Terrance Ellis and Krystal Wilson, all who testified that defendant told them he committed the armed robberies at issue. Defendant challenges their testimonies as unreliable, unbelievable and tainted.
Defendant also challenges the sufficiency of his identification in counts seven and eight. In these counts, defendant contends only one witness, the victim Felicia Knight, was able to identify him as the perpetrator. He questions the reliability of her identification based on publicity. He asserts Ms. Knight recognized him in the photographic lineup only after seeing his picture in the newspaper where he was identified as a suspect in the robbery.
Finally, defendant challenges the sufficiency of the evidence regarding count six, the armed robbery of Walter Yrle. Defendant alleges the State failed to prove all the essential elements of armed robbery. He argues that because the victim did not see a gun, the State at most proved first degree robbery.
When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 834.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the identity of the perpetrator. State v. Vasquez, 98-898 (La.App. 5 Cir. 2/10/99), 729 So.2d 65, 69. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id.

1. Proof of Defendant's Identity in Counts One through Six and Nine through Eleven

Defendant argues the testimony of Keenan Holmes, Terrence Ellis and Krystal Wilson that defendant told them he had committed several robberies was insufficient to convict him of the computer store robbery (counts one through five), the robbery and kidnapping of Mr. Yrle *173 (counts six and eleven), and the robbery of Mr. and Mrs. Hand (counts nine and ten). Defendant contends Holmes' testimony was unbelievable because he was given a lenient sentence in exchange for his testimony against defendant. Defendant also maintains the testimonies of Ellis and Wilson were tainted but does not explain how.
In the three robberies at issue in these counts, the perpetrator was masked and the victims were unable to identify defendant as the perpetrator of the robberies. Keenan Holmes was a co-defendant in the computer store robbery (counts one through five). At the time of defendant's trial, Holmes had pled guilty to all five counts of armed robbery and was promised a sentence between 10 and 25 years if he testified in defendant's trial.
Louisiana jurisprudence provides that a defendant can be convicted on the uncorroborated testimony of an alleged accomplice. State v. May, 339 So.2d 764, 775 (La.1976). An accomplice is qualified to testify against a co-perpetrator even if the prosecution offers him inducements to testify. The inducements merely affect the witness's credibility. State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 658, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
At trial, Holmes testified that he and defendant robbed the computer store together. He explained the robbery in detail corroborating the testimony of the victims. Holmes testified defendant went into the store first wearing a black hooded sweater and bandanna. Holmes followed with a handgun and bandanna. Holmes stated defendant took one of the victims to the cash register and took the money out of the register. Defendant then started taping the victims. Holmes testified he took a wallet from one of the victims and defendant took a cell phone. Holmes also stated there were two kids in the store at the time of the robbery who were made to lie on the floor.
Holmes further testified that on the way to the computer store, defendant told him about another robbery at a computer store where defendant kidnapped a man, stole $4,000, duct-taped the man, put him in the back of his own car and drove him from the westbank to the eastbank. After Holmes and defendant robbed the PC Direct computer store, defendant told Holmes of a robbery he committed at Domino's where he acted like one of the employees. Later, defendant called Holmes to see if Holmes "wanted to do something else" with him. At that time, defendant told Holmes about a robbery where he robbed two old people. Defendant explained the man fought back and defendant hit him with the pistol.
Defendant claims Holmes' testimony identifying him as the perpetrator of the crimes is unbelievable because Holmes was offered a lenient sentence in exchange for his testimony. As stated above, inducements to testify merely affect the credibility of the witness. The credibility of a witness is within the sound discretion of the trier of fact. It is not the function of the appellate court to assess credibility or reweigh the evidence. State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062, and 00-0150 (La.6/30/00), 765 So.2d 1066.
Holmes testified he gave the police the same information regarding the robbery he was involved in and the robbery involving the man in the trunk at the time of his arrest. Holmes explained that he did not have any "deals" when he gave his statement to the police. The jury was fully aware that Holmes had entered into a plea agreement with the State whereby he would testify against defendant in exchange *174 for a lenient sentence. Nonetheless, the jury chose to believe Holmes that defendant was the perpetrator in the crimes at issue.
Defendant also complains the testimony of Terrence Ellis and Krystal Wilson was tainted but he does not specify how. Ellis testified that he was picked up by defendant and Holmes around 9:00 p.m. on the night of December 30, 1999, the date of the PC Direct robbery. Ellis testified defendant and Holmes told him they had just committed a robbery where they had robbed people and taped them up. Ellis stated defendant and Holmes were wearing dark colors. He also stated defendant had a cell phone and Holmes had a gun and bandanna. Ellis further testified that his phone number appeared four separate times on December 31, 1999 on S-19, the cell phone statement of victim, Willie Jordan, Sr.
During defendant's testimony, he suggested there was a grudge between himself and Ellis. The jury heard all this testimony and obviously chose to believe Ellis.
Krystal Wilson, defendant's girlfriend at the time of the robberies, testified as a rebuttal witness for the State. She stated she was picked up by defendant and Holmes on December 30, 1999 between 8:00-9:00 p.m. They then picked up Terrence Ellis. She was in the front passenger seat and Holmes and Ellis were in the backseat. She heard defendant tell Ellis he had just "hit a lick," or a robbery. Wilson stated defendant had a gun on his lap and a cell phone, which defendant said he got in the robbery.
Wilson also testified about the Domino's pizza robbery. She explained that she was present in the car when the robbery occurred. She, defendant, and a person identified as "Mike" went to Domino's to get pizza. Wilson stayed in the car and did not see what happened inside the store. Defendant gave her $100 and told her the next day that he had robbed the Domino's.
Sometime later, the two passed a business on the Westbank Expressway. Defendant pointed out the business and told her about robbing a man of $4,000 and taking him across the river. Wilson also stated defendant called her from jail and told her he was sorry he had ever robbed the judge's parents. Wilson did not know what happened in that robbery but testified defendant owned the Rolex watch with diamonds pictured in S-20, that was recovered from the Hand robbery.
On cross-examination, Wilson admitted the police told her they may charge her with the robberies unless she cooperated. She stated she did not want to testify. Also during her testimony, Wilson explained that she became pregnant with defendant's baby and gave the baby up for adoption. She stated she was not angry with defendant for the pregnancy and adoption.
Once again, the jury heard all the testimony regarding possible inducements for Wilson's testimony and possible grudges she may have harbored against defendant. Nonetheless, the jury obviously chose to believe Wilson that defendant had committed the robberies at issue.
Keenan Holmes and Krystal Wilson recounted testimony that identified defendant as the perpetrator of the robberies of the PC Direct computer store and Domino's pizza and the robbery and kidnapping of Walter Yrle. Terrence Ellis' testimony identified defendant as the perpetrator of the robberies at PC Direct. Many aspects of Holmes, Ellis and Wilson's testimonies are corroborated by the victims' testimonies. The jury heard all the evidence regarding inducements and grudges *175 and apparently still chose to believe the testimony of Holmes, Ellis and Wilson. Viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could find, beyond a reasonable doubt, that defendant was the perpetrator the crimes in counts one through six and nine through eleven.

2) Proof of Defendant's Identity in Counts Seven and Eight

Counts seven and eight relate to the Domino's pizza robbery. Victim, Felicia Knight, was the only witness to identify defendant as being the perpetrator of the robbery. Ms. Knight testified that defendant was not masked and, therefore, she had a clear view of him. Ms. Knight explained she and defendant carried on a conversation with only three to four feet between them. She positively identified defendant as the perpetrator without hesitation in a photographic lineup and again in court.
Defendant suggests Ms. Knight recognized him from the newspaper as opposed to the night of the robbery. On cross-examination, Ms. Knight was asked whether she had seen or read any newspaper articles about the robberies or seen any pictures of any individuals in the newspaper. She replied that she had not.
It is the fact finder's function to determine the weight of the evidence bearing on the defendant's identification. It is not the appellate court's function to reevaluate the credibility choices made by the fact finder. State v. Spencer, 93-571 (La. App. 5 Cir. 1/25/94), 631 So.2d 1363, 1370, writ denied, 94-488 (La.2/3/95), 649 So.2d 400.
The jury apparently chose to believe Ms. Knight's testimony identifying defendant as the perpetrator of the armed robbery. Positive identification by only one witness is sufficient to support a conviction. State v. Cowart, 01-1178 (La.App. 5 Cir. 3/26/02), 815 So.2d 275, 283 (citing State v. Mussall, 523 So.2d 1305, 1311 (La.1988)). Viewing the evidence in a light most favorable to the prosecution, it appears a rational trier of fact could find, beyond a reasonable doubt, that defendant was the perpetrator of the Domino's pizza armed robbery.

3) Sufficiency of the Evidence on Count Six

Defendant asserts there was insufficient evidence to convict him of armed robbery in count six, the incident involving Walter Yrle. He argues Mr. Yrle never testified that he saw a gun and, therefore, the State at most proved first degree robbery.[4]
The elements of armed robbery are: 1) a taking, 2) of anything of value, 3) from the person or in the immediate control of another, 4) by the use of force or intimidation, 5) while armed with a dangerous weapon. LSA-R.S. 14:64; State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 965, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839. Defendant only complains that the State failed to prove the last element of the crime, that he was armed with a dangerous weapon.
The term dangerous weapon "includes any gas, liquid or other substance or instrumentality which, in the manner used, is calculated or likely to produce death or great bodily harm." LSA-R.S. 14:2(3). The "dangerousness" of the instrumentality by reason of the *176 manner in which it is used is a question of fact for the jury to decide. State v. Ellis, 95-1005 (La.App. 5 Cir. 3/26/96), 672 So.2d 1007, 1108-1109. Various objects have been held to be dangerous weapons for purposes of LSA-R.S. 14:64 including an ink pen, tennis shoe, metal sign post, hammer, and liquor bottle hidden in a pocket.[5] No weapon need ever be seen by the victim, or witnesses, or recovered by the police for the trier of fact to be justified in finding that defendant was armed with a dangerous weapon. State v. Ellis, supra at 1009.
In State v. Cotton, 94-384 (La.App. 5 Cir. 11/16/94), 646 So.2d 1144, this Court found sufficient evidence to uphold defendant's armed robbery conviction where the victim testified the defendant approached him and pressed a hard, sharp object to his side. The defendant further told the victim to look straight ahead and he would not get hurt. The victim believed defendant had a knife but did not see a weapon. This Court explained that "Simply because the victim did not see a dangerous weapon does not preclude an armed robbery conviction. When defendant creates an atmosphere of intimidation prompting the victim to reasonably react with fear for his life, an armed robbery conviction is justified." Id. at 1146.
Also, see State v. Talbert, 416 So.2d 68 (La.1982), wherein the Louisiana Supreme Court upheld defendant's armed robbery conviction even though the victim never saw a weapon.
In the present case, the victim, Walter Yrle, testified that a masked man approached him yelling, "Get down! Get down or I'll blow you away." Mr. Yrle specifically stated the man appeared armed and explained:
in his left hand, he, uhleft hand was also covered by something red. Uh, part of the hand stuck out, and there was something black coming out of there. And he held his had [sic] like this (Indicating), the way a policeman would hold it, and he was in sort of a crouched position, coming toward me.
As a result of defendant's actions, Mr. Yrle laid spread-eagle on the ground. Mr. Yrle testified that the perpetrator then "put something in my back" and took his keys and laptop computer. Later in his testimony, Mr. Yrle was asked by the prosecutor whether he felt a weapon or anything touch him in his back at any time. Mr. Yrle replied "[y]es, when I was laying on the ground in the, uhin the parking lot, uh, something was pressed to my back, uh, when he first came up to me." Mr. Yrle could not say with any certainty that the gun introduced into evidence was the object he saw on the night of the robbery and stated on cross examination that he could not say whether the object he saw that night was even a gun.
The mere fact the victim did not see a dangerous weapon does not preclude an armed robbery conviction. Here, defendant created an atmosphere of intimidation when he approached the victim in a crouched position, holding a black object in his hand like a policeman would hold a gun, and threatened to "blow away" the victim if he did not cooperate. Mr. Yrle, clearly fearing his life, immediately laid down spread eagle in a parking lot. We find sufficient evidence to support the *177 jury's determination that defendant was armed with a dangerous weapon.
Defendant's allegations that insufficient evidence exists to support his convictions are without merit.

EXCESSIVE SENTENCE
In his first allegation of error, defendant argues his aggregate 881-year sentence is excessive. He maintains the evidence against him was not overwhelming and contends he received a longer sentence than what is reserved for murderers. He contends that in nine out of the ten counts, the victims were not physically harmed. He argues the small amount of money taken in the robberies and the method of the robberies do not justify his 881-year sentence. He points out his co-defendant, Keenan Holmes, only received 25 years total for five counts where he received 150 years for the same five counts. Defendant also asserts the consecutive nature of his sentence is excessive. He further argues he was impermissibly sentenced as a multiple offender on both counts nine and ten, the Hand robberies, because the two convictions arose out of the same criminal episode.

1) Enhanced Sentences on Counts Nine and 10

During the multiple offender hearing, the prosecutor advised the trial court that the State multiple billed defendant on four counts, one from each of the four incidents and all four counts being armed robberies. The prosecutor then specifically named the four armed robbery counts as being those related to the armed robberies of Peter Hand (count nine), Walter Yrle (count six), Andrew Hungerford (count one), and Cheryl Richardel (count seven). Although not mentioned by the prosecutor during the multiple offender hearing, the multiple bill shows count ten, the armed robbery of Gaynelle Hand, was included among the counts sought to be enhanced.[6]
At the conclusion of the hearing, the trial court found defendant to be a second felony offender. The trial court then imposed sentence on all eleven counts with enhanced sentences on counts one, six, seven, nine and ten.[7]
Defendant's argument that he cannot be multiple billed on two counts that arise out of the same criminal episode has merit. When a defendant is convicted on the same day of separate felonies arising out of separate criminal offenses committed at separate times, he is subject to being adjudicated a habitual offender as to each conviction. State ex rel. Porter v. Butler, 573 So.2d 1106, 1109 (La.1991). However, only one underlying conviction arising out of a multi-count bill of information can be enhanced when the convictions were entered on the same day and when the offenses arise out of a single criminal act or one criminal episode. Id.; State v. Luna, 00-858 (La.App. 5 Cir. 10/31/00), 772 So.2d 249, 259, writ denied, 00-3244 (La.10/2/01), 799 So.2d 495.
In the present case, counts nine and ten arise from one criminal episode committed at the same time on the same day. Mr. and Mrs. Hand were robbed in their house on January 28, 2001. Thus, the trial court erred in finding defendant a habitual offender as to each of these convictions. Accordingly, it is recommended that the findings and sentences of defendant under *178 the habitual offender statutes on counts nine and ten be set aside and the case remanded to the trial court for resentencing on counts nine and ten, with finding and sentencing as a habitual offender on only one of the counts, either nine or ten. See, State ex rel. Porter v. Butler, supra at 1107.

2) Excessiveness of Sentence on Counts One through Eight and Eleven

In the PC Direct computer store robberies, defendant was sentenced to 150 years on count one as a second felony offender and 99 years, the maximum allowed by law, on each of the counts two through five.[8] The sentences were ordered to run concurrently with each other but consecutive to all other counts. In the Yrle incident, defendant was sentenced to 175 years as a habitual offender on count six, the armed robbery, and 40 years, the maximum allowed by law, on count eleven, second degree kidnapping. These sentences were also ordered to run concurrently with each other but consecutive to all other counts. For the Domino's pizza robberies, defendant was sentenced to 160 years as a habitual offender on count seven and 99 years, the maximum allowed by law, on count eight. Again, the trial judge ordered these sentences to run concurrent with each other but consecutive to all other counts. Excluding defendant's sentences on counts nine and ten, which need to be set aside as discussed supra, defendant received a total of 485 years. All sentences were imposed without the benefit of parole, probation or suspension of sentence. Defendant complains that his aggregate sentence is excessive.
In sentencing defendant, the trial judge noted that defendant's conduct during the crimes manifested deliberate cruelty to the victims and that he knowingly created a risk of death or great bodily harm to more than one person. The trial judge further noted that defendant deliberately faked insanity early in the proceedings and, thus, attempted to manipulate the court system to avoid facing justice.
Regarding the PC Direct computer store robberies, the trial judge noted that defendant did not physically hurt anyone but found defendant committed the crime with "military precision" and was not a novice. In imposing sentence in the Yrle incident, the trial court again noted defendant did not physically harm the victim. The court noted the Mr. Yrle believed he was going to die when defendant put him in the trunk. Regarding the Domino's pizza robbery, the trial court stated defendant made the victims fear for their lives for a "long period of time."
LSA-C.Cr.P. art. 881.1 requires a defendant to make or file a motion to reconsider sentence and state the specific ground upon which a motion to reconsider sentence is based, including a claim of excessiveness, or he is precluded from raising the issue on appeal. In the present case, no objection was made to the sentence and no motion for reconsideration was filed by defendant. As such, defendant's sentences can only be reviewed for constitutional excessiveness. State v. Anderson, 01-789 (La.App. 5 Cir. 1/15/02), 807 So.2d 956, 961.
Defendant does not contend that any sentence on its own is excessive. Rather, defendant urges that his sentences together are excessive because the trial judge imposed consecutive sentences and because he received more time than his co-defendant.
*179 Both the United States and the Louisiana Constitutions prohibit the imposition of excessive or cruel punishment. U.S. Const. amend. VIII; La. Const. of 1974, art. I, § 20. A sentence is constitutionally excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or is nothing more than the needless and purposeless imposition of pain and suffering. State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839. Trial judges are granted great discretion in imposing sentences and sentences will not be set aside as excessive absent clear abuse of that broad discretion. State v. Bacuzzi, 97-573 (La.App. 5 Cir. 1/27/98), 708 So.2d 1065, 1068-1069.
In reviewing a sentence for excessiveness, this Court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock our sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing sentence. State v. Brown, 99-172 (La. App. 5 Cir. 9/28/99), 742 So.2d 1051, 1056, writ denied, 99-3148 (La.4/20/00), 760 So.2d 340. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Watts, 99-311 (La.App. 5 Cir. 8/31/99), 746 So.2d 58, 64, writ denied, 99-2733 (La.3/24/00), 758 So.2d 145. In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. Id.
Defendant first contends his sentence is excessive because his co-defendant was promised a 10-25 year sentence for five counts of armed robbery where he effectively received a 150-year sentence.[9] There is no requirement that co-defendants be treated equally by the sentencing judge. State v. Rogers, 405 So.2d 829, 831 (La.1981); State v. Francois, 01-807 (La. App. 5 Cir. 4/10/02), 817 So.2d 213, 216. The disparity of sentences between co-defendants is only a factor to be considered along with all other appropriate considerations in evaluating a contention that a sentence is excessive. State v. Quimby, 419 So.2d 951, 962 (La.1982); State v. Francois, supra. Defendant was involved in four separate incidents whereas his co-defendant was only involved in one of the incidents and, as previously noted, defendant was adjudicated to be a multiple offender.
Defendant also alleges the consecutive nature of his sentences results in an excessive sentence. LSA-C.Cr.P. art. 883 provides in pertinent part:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
Defendant's convictions resulted from four separate courses of conduct that occurred on four separate days over a one-month period. Defendant received concurrent sentences on those counts arising *180 from a single course of conduct. His four groups of sentences were then ordered to run consecutively with each other. Defendant's consecutive sentences were justified and imposed in accordance with LSA-C.Cr.P. art. 883. See, State v. Dillon, 01-0906 (La.App. 5 Cir. 2/26/02), 812 So.2d 770, 774.
In the present case, defendant committed eight armed robberies and a second degree kidnapping on three separate days, excluding counts nine and ten. The victims were placed in grave danger and could easily have been killed. They were emotionally harmed as a result of the robberies. No presentence investigation report was ordered but the record shows defendant had a violent criminal history. He was found to be a second felony offender based on a prior conviction for second degree battery. In that conviction, defendant was charged with attempted murder but pled guilty to the lesser offense. Based on these circumstances, we find that defendant's aggregate sentence is not constitutionally excessive.
We further note that a remand for resentencing on the issue of excessiveness of defendant's aggregate sentence would be "an academic exercise which has no practical benefit to anyone." State v. Franklin, 519 So.2d 292, 295 (La.App. 5 Cir.1988) (citing State v. Mosley, 466 So.2d 733 (La. App. 4 Cir.1985), writ denied, 468 So.2d 1202 (La.1985)). In Mosley, supra, at 736, the Fourth Circuit noted:
Whether his sentence is 99 years of 297 years he will be in jail for the rest of his life unless he is pardoned. Remanding for resentencing under these circumstances is an academic exercise which has no practical benefit to anyone. It is the type of exercise which subjects judges and lawyers to well deserved criticism for wasting time on technicalities.
As noted above, defendant does not complain that any one of his sentences is excessive. Thus, whether defendant spends 99 years, 160 years or 485 years is immaterial. He will be in prison for the rest of his natural life unless he is pardoned.
In his third allegation of error, defendant alleges that the trial court erred in failing to recuse itself and appoint an ad hoc judge to hear the case.
Defendant filed a written motion to recuse on the basis he could not receive a fair and impartial trial because two of the victims were parents of Jefferson Parish Magistrate, Jeff Hand. Defendant maintained any judge sitting in the Twenty-Fourth Judicial District Court would be "biased, prejudiced and personally interested in the outcome" of the matter. He sought to have Judge Bodenheimer and any other judge in the Twenty-Fourth Judicial District Court recused from his case and sought the appointment of an ad hoc judge for all his proceedings. He alternatively requested that an ad hoc judge hear his motion to recuse.
No ad hoc judge was appointed to hear the motion to recuse. Rather, the motion was referred to another judge in the district, Judge Robert Pitre. At the hearing on the motion to recuse, no evidence was presented. Rather, defense counsel merely argued defendant could not receive an unbiased trial and would be prejudiced by the fact two of the victims were the parents of Jeff Hand, who was "very well known in this District." In denying the motion, Judge Pitre stated:
I've gone over the recusal articles, there's nothing in the recusal articles that would fit this situation. I don't see any grounds, there's no showing of bias or prejudice, or any personal interest on the part of Jeff Hand. I'm going to deny the motion.
*181 The State argues defendant failed to preserve his right to appeal this issue because he failed to contemporaneously object to the trial court's denial of his motion to recuse. The State cites LSA-C.Cr.P. art. 841 in support of its position. Article 841(B) specifically states, "The requirement of an objection shall not apply to the court's ruling on any written motion." Defendant's motion to recuse was in writing and, therefore, the contemporaneous objection rule is not applicable.
LSA-C.Cr.P. art. 671(A) provides:
(A) In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;
(3) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
(4) Is a witness in the cause;
(5) Has performed a judicial act in the case in another court; or
(6) Would be unable, for any reason, to conduct a fair and impartial trial.
These grounds are exclusive, not illustrative. In re Lemoine, XX-X-XXXX (La.1/14/97), 686 So.2d 837, 843, on reh'g, XX-X-XXXX (La.4/4/97), 692 So.2d 358. The party desiring to recuse a trial judge shall file a written motion assigning the ground for recusal. LSA-C.Cr.P. art. 674. If a valid ground for recusal is set forth in the motion for recusal, the judge shall either recuse himself, or, in a court having two or more judges, as is the case in the instant matter, refer the motion to another judge of that court. LSA-C.Cr.P. arts. 674 and 675.
A trial judge is presumed to be impartial. In order to obtain a recusal based on bias, prejudice, and personal interest, the party seeking the recusal must establish more than conclusory allegations. State v. Davis, 00-1753 (La. App. 5 Cir. 4/24/01), 786 So.2d 834, 843. In State v. Parker, 96-1852 (La.App. 4 Cir. 6/18/97), 696 So.2d 599, 607, writ denied, 97-1953 (La.1/9/98), 705 So.2d 1097, the Fourth Circuit held that a recusal is not required simply on the basis the trial judge knew the victim's family. In Parker, it was established the trial judge knew the victim's nephew. The court stated that defendant had produced no evidence to support the allegations that the trial judge was bias or prejudiced.
Likewise, in the present case, defendant offered no evidence of Judge Bodenheimer's bias or prejudice. At the hearing on the motion to recuse, defendant merely made a broad conclusory statement:
I filed a motion for a recusal, based on the fact that one of the victimsactually, two of the victims in one of the armed robberies that Mr. Page is charged with, were the parents of Mr. Jeff Hand, and my client feels that he cannot receive an unbiased trial, he would be prejudiced by the fact that Mr. Hand is very well known in this District.
Defendant did not even allege that Judge Bodenheimer knew Jeff Hand. There is nothing in the record to support defendant's allegations that Judge Bodenheimer *182 or any other judge in the Twenty-Fourth Judicial District Court was biased or prejudiced. Therefore, we find no error in the denial of defendant's motion to recuse.
As requested by defendant, the record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). We have reviewed the record and we find no errors patent in this case.
For the above-discussed reasons, defendant's eleven convictions and the sentences in counts one through eight and eleven are affirmed. The court's findings of habitual offender status on counts nine and ten, and his enhanced sentences on those two counts are vacated and set aside, and this matter is remanded.
CONVICTIONS IN ELEVEN COUNTS AND SENTENCES IN COUNTS ONE THROUGH EIGHT, AND ELEVEN ARE AFFIRMED; FINDING OF HABITUAL OFFENDER AND ENHANCED SENTENCES IN COUNTS NINE AND TEN VACATED AND SET ASIDE, CASE REMANDED.
NOTES
[1] Co-defendant, Keenan Holmes, was charged with armed robbery along with defendant in counts one through five.
[2] The victim's initials are used under the authority of LSA-R.S. 46:1844 which provides for the use of the initials of a crime victim who is a minor.
[3] Mr. Hand was deceased at the time of trial.
[4] First degree robbery is the taking of anything of value belonging to another from the person of another by the use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon. LSA-R.S. 14:64.1.
[5] State v. Johnson, 598 So.2d 1152 (La.App. 1 Cir.1992), writ denied, 600 So.2d 676 (La. 1992); State v. Munoz, 575 So.2d 848 (La. App. 5 Cir.1991), writ denied, 577 So.2d 1009 (La.1991); State v. Clark, 527 So.2d 542 (La. App. 3 Cir.1988), writ denied, 569 So.2d 977 (La.1990); State v. Smith, 450 So.2d 714 (La. App. 4 Cir.1984); State v. McMorris, 343 So.2d 1011 (La.1977).
[6] The multiple bill was amended on November 29, 2001, the same day as the multiple offender hearing, to include count ten among the counts sought to be enhanced.
[7] Defendant received 150 years on count one, 175 years on count six, 160 years on count seven, and 198 years each on counts nine and ten.
[8] As a second felony offender, defendant faced an enhanced sentencing range of 45½ years to 198 years. LSA-R.S. 15:529.1(A)(1)(a).
[9] Defendant received a 150-year enhanced sentence on count one and 99 years on each counts two through five to run concurrently.