914 So.2d 74 (2005)
STATE of Louisiana, Appellee
v.
Reagan GATTI, Appellant.
No. 39,833.
Court of Appeal of Louisiana, Second Circuit.
October 13, 2005.
*81 Louisiana Appellate Project, by Peggy J. Sullivan, Monroe, Reagan Gatti, for Appellant.
John Schuyler Marvin, District Attorney, John Michael Lawrence, Assistant District Attorney, for Appellee.
Before GASKINS, PEATROSS and DREW, JJ.
DREW, J.
Defendant was convicted by jury of eight Bossier Parish crimes, all offenses occurring on the same day:
 aggravated flight from an officer, La. R.S. 14:108;
 attempted aggravated burglary, La. R.S. 14:60 and La. R.S. 14:27;
 aggravated burglary, La. R.S. 14:60;
 attempted second degree kidnapping, La. R.S. 14:44.1 and La. R.S. 14:27;
 second degree kidnapping, La. R.S. 14:44.1;
 attempted second degree murder, two counts, La. R.S. 14:30.1 and La. R.S. 14:27; and
 unauthorized entry of an inhabited dwelling, La. R.S. 14:62.3.
Sentenced to a total of 163 years at hard labor, the defendant appeals his convictions on seven of the charges and all of the sentences. We reverse the conviction of second degree kidnapping for lack of evidence. We affirm the attempted second degree kidnapping conviction but vacate the illegally-lenient sentence and remand for re-sentencing. We affirm the conviction and sentence on each of the other six charges.

FACTS
On March 13, 2003, Gatti and others robbed the occupants of an armored car in Shreveport of three quarters of a million dollars. Besides Gatti, the gang included:
 Larry Thompson, Sr. ("Larry Thompson");
 his son, Larry Neal Thompson, Jr. ("Neal Thompson");
 two brothers, Nicholas Gentry and Anthony Gentry; and
 Tung Nguyen ("Nguyen").
All six robbers fled to an apartment complex in Shreveport, where they moved loot, guns, and protective vests from a Chevrolet Suburban into a green minivan. They drove east on I-220, with Neal Thompson driving and Nguyen in the front passenger seat. Larry Thompson and Anthony Gentry were in the middle of the van, with Nicholas Gentry and Gatti in the rear. Gatti and Nicholas Gentry were armed with semi-automatic AK-47 rifles, loaded with high-capacity magazines.
When the gang was spotted getting into the green minivan, a BOLO alert was issued. Shreveport Police Department Officer Mark Sharbono spotted the van at the Shreveport-Blanchard Highway exit off I-220. Sharbono turned on his lights and chased the van, which was speeding over 90 miles per hour. Gatti fired several times at the S.P.D. patrol unit. One round struck the officer in the arm.
*82 After being shot, Officer Sharbono was unable to continue his pursuit and pulled his car off the road. Officer Dwayne Cortez, who was following behind Officer Sharbono, continued the pursuit of the van, with speeds still exceeding 90 miles per hour. The pursuit continued into Bossier Parish, ending in the Greenacres subdivision of Bossier City.
Once in the subdivision, the van pulled into the garage of a home on Wesley Circle, owned by John Stanley Palmer. Mr. Palmer:
 saw armed men getting out of a green van;
 heard them trying to break in his door;
 locked his door, called 911, armed himself with a pistol; and
 fired at the door, which Gatti was kicking.
The robbers never actually entered the living area of the Palmer house, though they entered the garage without authorization. Mr. Palmer chased them off by firing into the door Gatti was trying to kick in.
The gang scattered throughout the neighborhood, leaving behind the bags of money, masks, gloves, bullet-proof vests, two-way radios, and most weapons. After the confrontation, Mr. Palmer saw that the driver's side door of his car was open. He saw no faces and could not identify Gatti as one of the masked men.
Larry Thompson was caught while pretending to weed a flowerbed in the neighborhood. Neal Thompson was quickly apprehended, hiding in a tree. Anthony Gentry was arrested in a nearby backyard.
Gatti, Nguyen, and Nicholas Gentry fled into to the home of William Walker, who was weeding his flowerbed, unaware of the invasion. Inside the home was Mrs. Rose Hagelmeier, his 93-year-old mother-in-law.
The three demanded car keys from Mrs. Hagelmeier. She neither gave them keys nor did she attempt to look for any keys. She also did not testify at trial. Nicholas Gentry and Nguyen, testifying as state's witnesses, denied that anyone threatened Mrs. Hagelmeier, nor held her hostage. She apparently kept walking around the house during this incident.
Shortly after the intrusion, Mr. Walker noticed his garage door was locked, and went to investigate. He saw two men holding guns. Gatti, still wearing a mask, pointed a gun at Walker, demanding keys to a vehicle.
Mr. Walker said "no," and ran out of the house with Nicholas Gentry in pursuit. Mr. Walker slammed the door on Gentry's arm, but was overpowered by him and thrown him to the ground. When Gentry demanded the truck keys, Mr. Walker told him the keys were in the truck.
The three ran from Walker's house. Nguyen peaceably surrendered. Gatti and Nicholas Gentry kept running, with the police giving chase. Nicholas Gentry was arrested without incident after he jumped a neighbor's fence, landing right next to a peace officer.
Shreveport Police Officers Scebern Willis and J.P. Creighton found Gatti, still wearing a ski mask and body armor, hiding in shrubs at Dr. Clint McAlister's home. The S.P.D. officers came to Bossier when they heard a fellow officer had been shot. Because Gatti had a holstered gun, they pulled their weapons and ordered him to get on the ground.
Gatti knelt, wiped his hands, then reached for his holstered gun as he stood up and fled, whereupon Officer Willis fired at him four times. Gatti returned fire as he ran into Dr. McAlister's backyard. The *83 officers took cover behind a fence, as several bullets struck the ground near them.
Gatti, who was hit twice by the officers, fired his 9-mm pistol 13 times in this exchange, though some of the rounds were fired to shoot out a sliding glass patio door, in order to gain entrance into the McAlister home.
The wounded Gatti used his cell phone to call 911 and tell them he was shot and wanted to surrender. The call was disconnected. Gatti attempted to call the captured Larry Thompson, whose cell phone was in the possession of B.C.P.D. Officer Todd Hylbert. The officer heard the cell phone ringing, saw "Ragan" on caller I.D., but didn't answer. Immediately learning that the suspect in Dr. McAlister's home had called 911 and wanted to surrender, Officer Hylbert punched the redial button. He recognized Gatti's voice from dealing with him for 12 years as a law officer. When Officer Hylbert made this statement at trial, Gatti's counsel objected and moved for a mistrial, which was denied by the trial court.
Officer Hylbert told Gatti to remove all weapons and his shirt prior to surrendering so the officers outside the home could see his waistband to make sure he wasn't armed. Gatti surrendered without further incident.
Gatti's blood-stained pistol, holster, extra magazines, bulletproof vest, gloves, and ski mask were later found in a bedroom in the McAlister home. DNA testing established the likelihood the blood on some of these items to be Gatti's was 1.6 quadrillion to one. The pistol had a fresh, fully loaded 14-round magazine in it, and one round in the chamber.
All six of the gang members were indicted on various charges. Gatti was indicted on eight counts: aggravated flight from an officer, three counts of aggravated burglary, two counts of aggravated kidnapping, and two counts of attempted first degree murder.
On July 21, 2003, Gatti and Nguyen pled not guilty on all counts. At the time, Gatti was represented by Daryl Gold, and Nguyen was represented by Peter Flowers. Neither Gold nor Flowers was present at arraignment. Attorney Kelly Long stood in for each missing counsel, without objection.
Larry Thompson was convicted separately. Nguyen and the Gentry brothers pled guilty with sentencing caps and agreed to testify against the remaining defendants. Gatti and Neal Thompson were tried together.
Near the end of trial, the trial judge, outside the presence of the jury, advised counsel in open court that earlier that morning he had stopped by the jury room to see if they had refreshments, where a juror advised that the jury wanted to see the neighborhood where the crimes occurred. The judge communicated this to the lawyers.
The state had no objection to the trial court's conversation with the jury. Gatti objected, a hearing was held, and a motion for mistrial denied.
Gatti then asked that the jury view the neighborhood, but refused to waive his presence at the scene. The trial court denied the request. We instructed the trial court to reconsider. The trial judge again denied the request, with comments relative to his familiarity with the Palmer and McAlister homes, in which he'd been a guest on many occasions. Gatti then filed a motion to recuse the trial court, based on these comments. The motion was heard and denied by Judge Ford Stinson, Jr. The state then rested and the defendants called no witnesses.
*84 The jury found the defendant guilty of aggravated flight from an officer, attempted aggravated burglary of the Palmer home, aggravated burglary of the Walker home, attempted second degree kidnapping of Mr. Walker, second degree kidnapping of Mrs. Hagelmeier, two counts of attempted second degree murder of the two S.P.D. officers, and unauthorized entry of the McAlister home.
After reviewing a presentence report, the court harshly sentenced the defendant. Gatti appeals seven of the eight convictions, and all sentences.

DISCUSSION

I. Sufficiency
The defendant argues there was insufficient evidence to support seven of the eight convictions: aggravated flight from an officer, attempted aggravated burglary of the Palmer home, aggravated burglary of the Walker home, attempted second degree kidnapping of Mr. Walker, second degree kidnapping of Mrs. Hagelmeier, and both counts of attempted second degree murder. He does not appeal the conviction for the unauthorized entry of the McAlister home.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard of appellate review for a sufficiency of the evidence claim is now legislatively embodied in La. C. Cr. P. art. 821. It does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
The Jackson standard is also applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.

A. Aggravated Flight From an Officer
La. R.S. 14:108.1 C. and D. provide:
C. Aggravated flight from an officer is the intentional refusal of a driver to bring a vehicle to a stop, under circumstances wherein human life is endangered, knowing that he has been given a visual and audible signal to stop by a police officer when *85 the officer has reasonable grounds to believe that the driver has committed an offense. The signal shall be given by an emergency light and a siren on a vehicle marked as a police vehicle.
D. Circumstances wherein human life is endangered shall be any situation where the operator of the fleeing vehicle commits at least two of the following acts:
(1) Leaves the roadway or forces another vehicle to leave the roadway.
(2) Collides with another vehicle.
(3) Exceeds the posted speed limit by at least twenty-five miles per hour.
(4) Travels against the flow of traffic.
La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Gatti makes the novel argument that he is not guilty of aggravated flight because the robbery had ended and they were merely taking someone to work when the pursuit started. He blames the driver, not himself.
This overlooks the fact that while Neal Thompson was driving 90 mph, Gatti was firing an AK-47 at the officer, ultimately forcing him off the road. A jury could have easily found that Gatti was directly involved in the commission of the crime of aggravated flight from an officer. He also continued to flee until cornered and caught. Evidence of flight, concealment and attempt to avoid apprehension is relevant in the charge of aggravated flight from an officer. State v. Ashley, 33,880 (La.App. 2d Cir.10/4/00), 768 So.2d 817, writ denied, XXXX-XXXX (La.12/8/00), 776 So.2d 466. Flight indicates consciousness of guilt and is a circumstance from which a jury may infer guilt. State v. Ashley, supra; State v. Brown, 618 So.2d 629 (La. App. 2d Cir.1993), writ denied, 624 So.2d 1222 (La.1993).

B. Attempted Aggravated Burglary of the Palmer Residence
La. R.S. 14:62(A) provides:
A. Simple burglary is the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, or any cemetery, with the intent to commit a felony or any theft therein, other than as set forth in R.S. 14:60.
La. R.S. 14:60 provides, in pertinent part:
Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.
La. R.S. 14:27 provides, in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
*86 Gatti argues that his conviction for attempted aggravated burglary of the Palmer home should be overturned because he did not try to steal anything or commit any felony in the garage. To the contrary, when the gang drove the van into this garage, Gatti tried to force his way into the house, but was stopped by gunfire from the owner.
Mr. Palmer testified that immediately after the gang fled, he noted that the door to his car was open. Within minutes after fleeing the Palmer home, Gatti was in the Walker home, attempting to steal a car. Viewing the evidence in a light most favorable to the state, a jury could have reasonably inferred that Gatti, intending to flee the police, entered Palmer's garage, broke open his kitchen door, and opened his car door without authorization, in an attempt to either steal Palmer's car or break into his home in order to facilitate further escape. See State v. Thompson, 39,454 (La.App. 2d Cir.3/2/05), 894 So.2d 1268. The jury actually could have found that Gatti committed the completed offense, because they had entered the garage.

C. Aggravated Burglary of the Walker Home
Gatti agrees that he was in the Walker home without authorization, but argues that no aggravated burglary occurred, as nothing was taken and no felony was committed in the home. In connection with this point, he impugns the reliability of the robbers who turned state's evidence.
The jury could have reasonably found that Gatti, Nguyen, and Nicholas Gentry committed this crime by breaking into the Walker home with the intent to steal the keys to a vehicle.

D. Attempted Second Degree Kidnapping of Mr. Walker
La. R.S. 14:44.1
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
(3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
C. Whoever commits the crime of second degree kidnapping shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence.
The jury could have reasonably found that Gatti, by pointing his gun at Mr. Walker in conjunction with Nicholas Gentry's chasing and holding Mr. Walker, was attempting to seize or imprison Mr. Walker as a hostage or shield from arrest by *87 the police, or otherwise to aid him in escaping.

E. Second Degree Kidnapping of Mrs. Hagelmeier
We find, on the record before us, a jury could not have reasonably found that Gatti participated in a kidnapping of Mrs. Hagelmeier. The elderly lady did not testify, and the sketchy testimony of the co-defendants about the interaction with Mrs. Hagelmeier falls far short of proving the offense of conviction. For one thing, there was no proof of the requirements of La. R.S. 14:44.1 B., as the record fails to reveal any:
 forcible seizing or carrying of the lady;
 enticing or persuading her to go anywhere; nor
 imprisoning or forcible secreting her.
It may have happened, but it wasn't proven. We must reverse this conviction.

F. Two Counts of Attempted Second Degree Murder
Gatti argues that he did not try to kill either of the officers in the McAlister backyard, having only fired in self-defense after the officers fired at him. He argues that no specific intent to kill was proven.
Attempted murder, whether first or second degree, requires the specific intent to kill and the commission of an overt act tending to accomplish that goal. State v. Huizar, 414 So.2d 741 (La.1982). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act. La. R.S. 14:10(1).
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. Huizar, supra. In reviewing the correctness of such a determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson, supra; Huizar, supra.
Gatti, while apparently surrendering to the S.P.D. officers, suddenly reached to his holster and ran. The officers were justified in firing at a person whose gang had just shot another officer. Gatti fired 13 times, some slugs landing 18 inches from the officers. These shots were overt acts proving specific intent to kill the officers. The fact that Gatti did not kill the officers does not vitiate a finding of the specific intent to kill.

II. Jury Selection  Failure to Challenge for Cause
Gatti appeals the denial of challenges for cause of six possible jurors.
La. C. Cr. P. art. 797 provides:
The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude *88 that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
When a defendant uses a peremptory challenge after a challenge for cause has been denied, the defendant, in order to obtain a reversal of his conviction, must show erroneous denial of the challenge for cause and use of all peremptory challenges prior to completion of the jury panel. La. C. Cr. P. art. 800; State v. Ross, 623 So.2d 643 (La.1993). A trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror. Such determinations will not be disturbed on review unless a review of the voir dire as a whole indicates an abuse of discretion. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683; State v. George, 26,867 (La.App. 2d Cir.4/5/95), 652 So.2d 1382, writ denied, 95-1151 (La.9/29/95), 660 So.2d 855.
A challenge for cause is not warranted where a prospective juror has volunteered an opinion seemingly prejudicial to the defense, but subsequently on further inquiry has demonstrated the ability and willingness to decide the case impartially according to the law and evidence. State v. Heard, 408 So.2d 1247 (La.1982); State v. Thompson, supra.
The voir dire process was eminently fair and painstakingly thorough. The trial court exhibited patience and wisdom in presiding over the picking of this jury. The denied challenges for each of the six prospective jurors are addressed separately, beginning with the closest call.

A. Alice Ponder
Ms. Alice Ponder, a certified nurse's assistant with an eighth-grade education, was the first prospective juror challenged. She stated that she:
 had heard of the crimes, but not recently;
 knew the case must be decided on the evidence presented at trial and not by news accounts or what neighbors said;
 understood and could follow the requirement that the state had to prove its case beyond a reasonable doubt before she could vote to convict;
 had two grandsons in prison in different states, but did not harbor any ill will towards the police or prosecutors for their sentences;
 understood that every defendant came into the courtroom presumed to be innocent until the state proved their guilt to a jury beyond a reasonable doubt; and
 understood that everyone charged with a crime has a right not to testify and this decision cannot be held against them.
In responses to defense counsel, however, she stated that:
 she thought people who went to trial had done something wrong;
 if they hadn't shot at the police, no one would have been hurt;
 those who don't testify might be ashamed, but not necessarily guilty;
 if people are arrested, they are probably guilty; and
 she firmly thought Gatti was probably guilty, because he wouldn't be in court had not done something wrong.
Shortly after this line of questioning, the trial court advised counsel that it thought he was unfairly leading the prospective juror.
*89 When the trial court again questioned Ms. Ponder, she stated that she:
 understood a defendant is presumed innocent until proven guilty; and
 knew that even if she thought a defendant did something wrong, she would vote not guilty unless the state proved guilt beyond a reasonable doubt.
When re-questioned by Gatti's counsel, Ms. Ponder further explained:
MS. PONDER: Well I meant that the officers would not have arrested him and brought him here if he hadn't done something wrong. That's why we have to go to get a jury to prove what he's done and what he hasn't done.
She continued that she:
 thought police officers could, though rarely, make an arrest of someone who hadn't done anything wrong;
 did not agree that police officers were more likely to tell the truth;
 understood (again) that a defendant is presumed innocent unless their guilt is proven beyond a reasonable doubt; and
 explained her position about police arresting individuals by saying that an arrestee had to have done something wrong to be arrested.
Some of these latter exchanges are troubling, though "done something wrong" is not an equivalent with "guilty of these crimes." This pliable prospective juror was exhaustively questioned and rehabilitated as a fair and impartial prospective juror, who understood the presumption of innocence.
Viewing Ms. Ponder's answers as a whole, it cannot be said the trial court abused its great discretion when it denied this challenge for cause.

B. Steven Thompson
Mr. Thompson indicated he would judge a witness by his demeanor, and not because he is a police officer, and he repeatedly stated he understood the law as to burden of proof and presumption of innocence.
The record shows Mr. Thompson initially gave answers that indicated he may be more likely to believe a police officer than another witness. After further questioning by the court and counsel, Mr. Thompson voiced his understanding that he should not automatically believe any witness, regardless of occupation. Mr. Thompson's initial confusing answer as to a defendant's presumption of innocence stemmed from a convoluted question by defense counsel asking him if he would vote to acquit if he had to vote before the state produced evidence. His answer was to the effect that he could not vote. The trial court noted that the hypothec was "ridiculous."
Viewing Mr. Thompson's answers as a whole, it cannot be said that the trial court abused its great discretion in denying this challenge for cause.

C. Kathy Hoover
The defendant argues that the examination of Ms. Hoover revealed an inability to follow the law. We disagree.
In the early stages of examination, she stated that she was self-employed as the sole operator of a beauty shop. The trial court called a bench conference to discuss releasing Ms. Hoover for hardship. The defense counsel opposed the release, requesting further questioning of Ms. Hoover. After questioning, Ms. Hoover repeatedly stated she would follow the law as given, that she understood the state had the burden of proving its case beyond a reasonable doubt, and that the defendant *90 was presumed innocent. She said serving would be a hardship, but she could serve.
The defendants challenged her, predicated on her employment problems and a lack of understanding of the law. The challenge was denied.
The court was within its discretion in refusing to dismiss her, even though she may have been worried about her business during trial, because she would nonetheless be able to concentrate on the trial, consider the evidence presented, and render a fair decision. See State v. Hattaway, 28,060 (La.App. 2d Cir.5/8/96), 674 So.2d 380, writ denied, XXXX-XXXX (La.1/10/97), 685 So.2d 141.

D. James Champion, Jr.
Although some of the answers by Mr. Champion reflected confusion about the law to be applied, he repeatedly stated that he knew:
 a defendant was presumed innocent;
 the state had the burden of proving guilt beyond a reasonable doubt;
 he must treat all witnesses equally;
 no defendant has to testify;
 he couldn't hold a defendant's decision not to testify against him;
 he could accept the law as instructed by the court;
 even if he thought a defendant was "probably" guilty, he would vote to acquit unless the crime was proven beyond a reasonable doubt; and
 if the state proved a defendant committed a crime, but not one in the indictment, he would vote not guilty.
The trial court did not abuse its discretion in denying this challenge.

E. Marcus McCalman
Gatti challenged Mr. McCalman for cause because of a close working relationship with law officers and his political support for the district attorney. Mr. McCalman, a tow truck operator, is on a rotating call basis in Bossier to tow wrecked or impounded vehicles. His boss helped the D.A. in a recent election, and McCalman had attended some campaign functions.
Although personal connections to and relationships with law enforcement personnel do not, by themselves, disqualify prospective jurors for cause, such associations and relationships are subject to careful scrutiny. State v. Alexander, 620 So.2d 1166 (La.1993). The question is whether the prospective juror could assess the credibility of each witness independently of his relationship with law enforcement. State v. Carlos, 618 So.2d 933 (La.App. 1st Cir.1993), writ denied, 623 So.2d 1305 (La. 1993). If bias or prejudice may be reasonably attributed to the relationship or association, the juror should be excused for cause. State v. Alexander, supra.
The trial court, in denying the challenge for cause, noted that:
 Mr. McCalman's relationship with the police departments would not affect his service as a juror;
 he was called to accident scenes pursuant to a set rotation, not subject to the preferences of the officers, much like trial courts appoint attorneys as curators; and
 nothing in the mere fact that Mr. McCalman supported the district attorney established bias or prejudice.
We find no abuse in the rejection of this challenge for cause.

F. Thomas Lee White, Jr.
Thomas White, a self-employed contractor, knew nothing of the case other than what he had heard on TV when it occurred. He testified that:

*91  the burden of proof was on the state;
 the defendant was presumed to be innocent and could not be compelled to testify against himself;
 he could not automatically believe a police officer;
 he knew Larry Thompson, from business dealings in the early 1960s, but he was not a friend;
 he was aware of the elder Thompson's past criminal activities, but would not judge the younger Thompson by what he knew about his father; and
 he could apply a beyond a reasonable doubt standard to the evidence.
This exchange occurred during questioning by Thompson, Jr.'s counsel:
MR. BLACKMAN: I noticed when the Judge mentioned that the defense doesn't have to prove anything you kind of paused. There's a rule that when the defendants come in the courtroom it's presumed they're innocent. If you had to vote right now Neal Thompson guilty or not guilty how would you vote?
MR. WHITE: I couldn't vote.
MR. BLACKMAN: Why not?
MR. WHITE: I don't know anything about it.
MR. BLACKMAN: Okay. Well wouldn't you vote not guilty then since you don't know anything?
MR. WHITE: No, I wouldn't vote at all.
MR. BLACKMAN: Okay. Even though the Judge has told you that he's presumed to be innocent?
MR. WHITE: I still wouldn't vote. You wouldn't have me here if they thought he was innocent.
Mr. White reaffirmed his understanding that the state had the burden of proving its case and that a defendant was innocent until proven guilty.
Even so, the defense challenged White for cause, asserting his answers showed he did not understand the presumption of innocence. The trial court denied the challenge, noting that the questioning on this issue was confusing and misleading. The trial court found a prospective juror would be confused by such an inquiry, and prohibited the attorneys from posing this hypothetical question to any more prospective jurors.
Mr. White stated that he understood that the defendant was presumed to be innocent, that the district attorney must prove the case beyond all reasonable doubt, and that the defendants are not compelled to produce any evidence. The trial court correctly denied these challenges.

III. No Continuance to Allow Obtaining Conflict-free Counsel
The right of a criminal defendant to the assistance of counsel during the proceedings against him is a cornerstone of our legal system. State v. Franklin, 400 So.2d 616, 620 (La.1981). As a general rule, our courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant she is representing.
In a pretrial context, the trial court has two options to avoid a conflict of interest: appoint separate counsel or take adequate steps to ascertain whether the risk of a conflict of interest is too remote to warrant separate counsel. State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116. Failure to do one or the other in a case in which an actual conflict exists requires reversal. State v. Carmouche, 508 So.2d 792 (La.1987) (on reh'g).
Three months after arraignment, and three days before trial, Gatti filed a Motion for Continuance so another lawyer could *92 enroll and prepare for the trial. The trial court denied the request for a continuance, but did not prevent another lawyer from enrolling.
Gatti and Nguyen were accompanied at arraignment by a "stand-in lawyer," appearing for Gatti's lawyer, Daryl Gold, and Nguyen's lawyer, Peter Flowers. The transcripts of Gatti's arraignment clearly shows that this lawyer did so with his full knowledge and consent. Appearing for absent counsel on a minor matter is a courtesy extended by lawyers to one another in this profession. Absolutely no prejudice has been shown.
Even if it can somehow be argued that there was a risk of a conflict of interest, the trial court was correct in finding that such a risk was so remote as not to warrant new counsel. This issue is a non-issue.

IV. Improper Communication Between Judge and Jury
On one of the last days of trial, the judge stopped by the jury room to ask if they needed any refreshments, whereupon a juror made an unsolicited request for the jury to be taken to the neighborhood in question. The trial court reported this to counsel, whereupon a hearing was held on this issue.
Gatti moved for a mistrial on two grounds:
 the illegal contact between the trial court and the jury, including answering questions; and
 the nature of the question by the juror indicated that the jury had been discussing the case, contrary to instructions.
Outside the presence of the jury, Deputy Russell Jones testified that he observed the trial judge enter the jury room and ask about their refreshments, and he also heard one of the jurors ask about visiting the neighborhood. Deputy Tommy F. McWilliams corroborated this testimony.
La. C. Cr. P. art. 791 provides, in pertinent part:
A. A jury is sequestered by being kept together in the charge of an officer of the court so as to be secluded from outside communication, except as permitted by R.S. 18:1307.2.
An unauthorized communication to the jury by a court official requires reversal of the verdict, if the communication is prejudicial to the accused. State v. Marchand, 362 So.2d 1090 (La.1978). The defendant is correct that any private communication or contact with a juror during a trial about a matter pending before the jury is deemed presumptively prejudicial. State v. Marchand, supra.
In Marchand, the bailiff was instructed to tell the jury that the trial court would not let them have a copy of the confession for a second time. Instead, the bailiff told the jury that the judge and the district attorney wanted them to see it, but the defendant's attorney did not.
The judge's visit to the jury room was a mistake. His response to the juror, however, was no different than if the juror had made the request in open court. The judge immediately disclosed this event to counsel, and properly addressed the matter outside the presence of the jury. Under these facts, the trial court's contact with the jury was not prejudicial. There has been no showing of actual prejudice. At most, this is harmless error.

V. No Trip to the Crime Scene
Only after learning of this request by a juror did Gatti make his request to view the scene. The motion was denied by the trial court because of security reasons.
*93 Gatti sought writs to this court. State v. Reagan Gatti & Larry Neal Thompson, Jr., 38,469-KW (La.App. 2d Cir.12/2/03), unpublished. We remanded, with these instructions:
The trial court may grant the motion to view the scene, with the defendants present, under such conditions as the court in its great discretion deems necessary to ensure:
1. the safety and security of the jury, court personnel, and the general public, including the comfort and well-being of the affected neighborhood;
2. the avoidance of reversible error (particularly including the concealment, to the degree possible, of any necessary shackles or restraints); and
3. absolute silence at the scene, or, in the alternative, making a recording of any narration by any witness;
The trial court may deny the motion to view the scene; however, it may not weigh or consider as a factor, in making this decision, the presence or absence of the defendants at the viewing. The trial court may consider:
(1) the amount and quality of the evidence previously adduced before the jury that might obviate any need to view the scene;
(2) safety and security issues; and
(3) the great danger of jury tainting or other reversible error.
The trial court held a hearing on this request, at which deputies detailed the difficulty of providing adequate security with Gatti present, requiring 30 to 35 armed officers and up to five days of preparation.
Deputy Patrick Lanius, who had provided courtroom security during the trial, testified of three security matters occurring during the trial:
 Gatti bent a pair of leg shackles on the edge of a metal bed;
 a paper clip was found at the defense table, straightened with the tip bent so as to pick the lock on handcuffs; and
 on December 1, 2003, the day before the hearing, Gatti told him that he did not want him to go because he believed Lanius was a nice guy and that something might happen to him if he went.
The trial court again denied Gatti's motion, noting that:
 security for jury selection and trial had taken weeks to plan;
 the defendant had months to request that the jury see the neighborhood;
 the request was not made until one of the last days of the trial;
 considering the safety and security of the jury, court personnel, and the general public, including the comfort and well-being of the affected neighborhood, the request was not practical or possible on such short notice;
 the concealment of the defendant's shackles to avoid tainting the jury would not be possible because the jury would have to see him with shackles;
 the requirement of total silence or full recording of any discussions could not be met because the court did not have the requisite facilities;
 Gatti had lengthy access to the state's photographs of the neighborhood; and
 he (the trial judge) had lived in the neighborhood for over 20 years and was a personal friend of Dr. McAlister, had often been in his home and the state's photographs accurately depicted the premises.
The trial court appropriately handled this request by considering the safety and *94 security of the jury, court personnel, and the general public.
The trial court certainly did not abuse its great discretion in this matter. But, even if the trial court was in error, rulings regarding allowing the jury to view crime scenes are subject to the harmless error analysis. Gatti has not shown how he was prejudiced in this matter. The evidence contains numerous photos of the neighborhood. In brief, Gatti makes conclusory allegations that he was somehow prejudiced by this ruling. We disagree.

VI. Failure to Recuse
In ruling on its denial of this request for a visit to the scene, the trial court stated that the state's photographs of the area were accurate, as he was familiar with the neighborhood, having frequently been a guest in the homes of two of the victims in this case. After these comments, Gatti sought to have the trial court recused.
La. C. Cr. P. art. 671 provides:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;
(3) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
(4) Is a witness in the cause;
(5) Has performed a judicial act in the case in another court; or
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
B. In any cause in which the state, or a political subdivision thereof, or a religious body is interested, the fact that the judge is a citizen of the state or a resident of the political subdivision, or pays taxes thereto, or is a member of the religious body is not of itself a ground for recusation.
A trial judge is presumed to be impartial. The burden is on the defendant to prove otherwise. The grounds for recusal based on bias "must be of a substantial nature." State v. Branch, 30,733 (La.App. 2d Cir.07/06/98), 714 So.2d 1277, 1285-6, writ denied, 98-2359 (La.01/08/99), 734 So.2d 1227. One seeking to recuse a judge must allege or provide a factual basis for his allegation of bias or prejudice and may not simply make conclusory allegations. State v. Jackson, 30,473 (La.App. 2d Cir.5/13/98), 714 So.2d 87, writ denied, XXXX-XXXX (La.11/6/98), 727 So.2d 444. La. C. Cr. P. article 671 does not require the recusal of a trial judge simply on the basis that the judge knew the victim or the victim's family. State v. Page, 02-689 (La.App. 5th Cir.1/28/03), 837 So.2d 165, writ denied, XXXX-XXXX (La.11/7/03), 857 So.2d 517.
At the recusal hearing, Judge Burchett testified that:
 he had lived in Greenacres subdivision for over 20 years, until 1993;

*95  he was regularly in Dr. McAlister's home before moving;
 he could not recall being in Dr. McAlister's home after 1993;
 he was also a friend of Mr. Walker, and until 1993, was often in his home;
 he and Dr. McAlister were members of the country club in Benton; and
 he recalled briefly discussing the case with Dr. McAlister.
Judge Stinson denied Gatti's motion to recuse the trial court, finding no evidence that his personal friendship with the victims would cause the court to reach any conclusion based on bias, prejudice or personal interest, further declaring that the trial court could conduct a fair and impartial trial.
We agree with Judge Stinson. No recusal should have been granted.

VII. Request for Mistrial Because of Prejudicial Comment
Officer Hylbert stated that he had dealt with Gatti as a police officer for 12 years. Gatti objects to this as an improper reference to other crimes.
La. C. Cr. P. art. 770 provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
* * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
About calling Gatti on Larry Thompson's cell phone, Officer Hylbert testified:
... I said, I'm Officer Hylbert with the Bossier City Police Department. And the voice said, well, is Larry alive. And I said, he is alive, he's in handcuffs in the back of my police car. And I said, who is this. And he said, this is Reagan. I said, Reagan Gatti, is this you? Because I've had dealings with him. I've been there 12 years. I've dealt with him before.
Evidence of a person's character or a trait of his character, such as a moral quality, is generally not admissible for the purpose of proving that he acted in conformity with that character or trait on a particular occasion. La. C.E. art. 404(B). The erroneous introduction of other crimes evidence is subject to harmless error review. State v. Salter, 31,633 (La.App. 2d Cir.2/24/99), 733 So.2d 58, writ denied, 99-0990 (La.9/24/99), 747 So.2d 1114. Mistrial, a drastic remedy, is warranted only when substantial prejudice would otherwise result to the accused. State v. Cooks, 36,613 (La.App. 2d Cir.12/4/02), 833 So.2d 1034.
A mistrial is mandatory when a judge, district attorney or court official refers to inadmissible other crimes' evidence in the presence of the jury. La. C. Cr. P. art. 770. For the purposes of La. C. Cr. P. art. 770, a police officer is not a "court official." State v. Carter, 412 So.2d 540 (La.1982); State v. Gene, 587 So.2d 18 (La.App. 2d Cir.1991), writ denied, 604 So.2d 993 (La.1992).
Factors which may be considered in determining whether a mistrial *96 is warranted are whether the statement was deliberately elicited by the district attorney, whether it was responsive to the question, and whether the witness purposely uttered it to prejudice the defendant. State v. Williams, 26,655 (La.App. 2d Cir.3/1/95), 651 So.2d 331, writ denied, 95-0777 (La.9/15/95), 660 So.2d 448. Generally, ambiguous or obscure references to other crimes made without explanation or elaboration do not prejudice the defendant. State v. Williams, supra; State v. Gene, supra.
Here, the trial court found Officer Hylbert's statement ambiguous and did not warrant a mistrial. We agree. Further, we do not discern that the officer intended to unfairly prejudice the defendant. There is no pattern of seeking to place before the jury inadmissible testimony about Gatti's past. What the officer said does not appear to be an intentional violation of Gatti's rights.
The court's offer of admonishment was declined by Gatti. The trial court has discretion to determine whether a fair trial is impossible, or whether an admonition is adequate to assure a fair trial when the alleged misconduct does not fit into the provisions for a mandatory mistrial, and the ruling will not be disturbed on review absent an abuse of discretion. State v. Powell, 598 So.2d 454 (La.App. 2d Cir. 1992); State v. McGuffey, 486 So.2d 1101 (La.App. 2d Cir.1986); State v. Johnson, 440 So.2d 838 (La.App. 2d Cir.1983). This ruling was correct.

VIII. Sentencing
At sentencing, the trial court noted:
 Gatti's criminal background, including several misdemeanor convictions and a 1995 felony theft conviction;
 the federal convictions for bank robbery and use of a firearm in a crime of violence, stemming from the armored car heist at issue here;
 Gatti was a 28-year-old second felony offender;
 Gatti's actions deserved the maximum sentences on each conviction;
 Gatti endangered the lives of dozens of peaceful citizens; and
 Because of this, consecutive sentences were called for.
Based on these findings, the trial court sentenced Gatti to a total of 163 years in prison, broken down as follows:
1. (Count 1) Aggravated Flight From An Officer  two years at hard labor, to be served consecutively with any other sentence;
2. (Count 2) Attempted Aggravated Burglary (of the Palmer home)  15 years at hard labor, to be served consecutively with any other sentence;
3. (Count 3) Aggravated Burglary (of the Walker home)  30 years at hard labor, to be served consecutively with any other sentence;
4. (Count 4) Attempted Second Degree Kidnapping of Mr. Walker  20 years at hard labor, to be served consecutively with any other sentence;
5. (Count 5) Second Degree Kidnapping of Mrs. Hagelmeier  40 years at hard labor, to be served consecutively with any other sentence;
6. (Count 6) Unauthorized Entry of Dr. McAlister's home  6 years at hard labor, a $1,000.00 fine, together with costs of trial, to be served consecutively with any other sentence;
7. (Count 7) Attempted Second Degree Murder (of Officer Creighton)  50 years at hard labor, to be served concurrently with the other attempted *97 second degree murder sentence; and
8. (Count 8) Attempted Second Degree Murder (of Officer Willis)  50 years at hard labor, served concurrently with the other attempted murder sentence.
La. C. Cr. P. art. 881.1(E) provides:
E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.
No motion to reconsider was filed, precluding the defendant from presenting sentencing arguments to the court of appeal which were not presented to the trial court. La. C. Cr. P. art. 881.1 E. In this situation, an appellate court may only consider a bare claim of constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993).
Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Lobato, 603 So.2d 739 (La.1992); State v. White, 37,815 (La.App. 2d Cir.12/17/03), 862 So.2d 1123.
As a general rule, maximum sentences are appropriate in cases involving the most serious violation of the offense and the worst type of offender. State v. Grissom, 29,718 (La.App. 2d Cir.8/20/97), 700 So.2d 541; State v. Walker, 573 So.2d 631 (La.App. 2d Cir.1991). That's exactly what we have here.
The trial court found Gatti to be the worst type of offender, a conclusion amply supported by the record. The defendant was part of an armed gang that committed armed robbery, then shot its way through two cities and terrorized an entire neighborhood. Most, if not all of the shooting was by the defendant. The trial court correctly stated it was a miracle that no citizens were hurt or killed. It cannot be said that these maximum sentences are illegal, grossly disproportionate to the severity of the offenses, or shocking to our sense of justice.
Gatti also argues making all but two of the sentences consecutive is constitutionally excessive.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. It is within a trial court's discretion to order sentences to run consecutively rather than concurrently. State v. Coleman, 32,906 (La.App. 2d Cir.4/5/00), 756 So.2d 1218, 1247-48, writ denied, XXXX-XXXX (La.3/23/01), 787 So.2d 1010.
Concurrent sentences arising out of a single cause of conduct are not mandatory, State v. Pickett, 628 So.2d 1333 (La. App. 2d Cir.1993), and consecutive sentences under those circumstances are not necessarily excessive. State v. Williams, 445 So.2d 1171 (La.1984); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.), writ denied, 508 So.2d 65 (La.1987).
Although La. C. Cr. P. art. 883 favors the imposition of concurrent sentences for crimes committed as part of the same transaction or series of transactions, a trial court retains the discretion to impose consecutive penalties in cases in which the offender's past criminality or other circumstances in his background justify treating him as a grave risk to the *98 safety of the community. State v. Walker, 00-3200 (La.10/12/01), 799 So.2d 461; State v. Feaster, 36,868 (La.App. 2d Cir.3/5/03), 840 So.2d 675.
Among the factors to be considered:
 the defendant's criminal history, State v. Jacobs, 493 So.2d 766 (La.App. 2d Cir.1986);
 the gravity or dangerousness of the offense, State v. Adams, 493 So.2d 835 (La.App. 2d Cir.), writ denied, 496 So.2d 355 ([La.]1986);
 the viciousness of the crimes, State v. Clark, 499 So.2d 332 (La.App. 4th Cir. 1986);
 the harm done to the victims, State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.), writ denied, 435 So.2d 433 ([La.]1983);
 whether the defendant constitutes an unusual risk of danger to the public, State v. Jett, 419 So.2d 844 (La.1982);
 defendant's apparent disregard for the property of others, State v. Parker, 503 So.2d 643 (La.App. 4th Cir.1987); and
 the potential for defendant's rehabilitation, State v. Sherer, 437 So.2d 276 (La.1983); State v. Lighten, 516 So.2d 1266 (La.App. 2d Cir.1987).
The trial court considered all of these factors, finding:
 Gatti to be unusually dangerous;
 the offenses to be particularly dangerous and vicious; and
 the harm and risk of harm to the public to be very high.
The record supports the trial court's findings. These sentences by the trial court are appropriate and not an abuse of discretion.
Gatti argues his sentences are excessive, totaling 10 times more than other co-defendants who accepted plea bargains and testified against him.
Co-defendants don't have to be treated equally at sentencing. State v. Rogers, 405 So.2d 829 (La.1981); State v. Taylor, 485 So.2d 117 (La.App. 2d Cir. 1986). The disparity of sentences between co-defendants is only a factor to be considered along with all other appropriate considerations in evaluating a contention that a sentence is excessive. State v. Quimby, 419 So.2d 951 (La.1982); State v. Jackson, 30,473 (La.App. 2d Cir.5/13/98), 714 So.2d 87.
Some of Gatti's co-defendants got on the train and agreed to testify. They, not Gatti, are entitled to reap the benefits of that decision.

IX. Error Patent
In sentencing Gatti for two counts of attempted second degree murder, the trial court failed to impose the sentences to be served without benefits, as required by La. R.S. 14:30.1 and 14:27. Also, in sentencing the defendant for attempted second degree kidnapping, the trial court failed to impose a determinate portion of the sentence (at least two years) to be served without benefits, as required by La. R.S. 14:44 and 14:27.
When a court fails to order service of sentence without benefits in a case in which a determinate time period to be so served is mandated by the statute of conviction, the sentence automatically will be served without benefits for the required time period. La. R.S. 15:301.1(A); State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790.
In contrast, when a district court fails to order service of sentence without benefits in a case in which an indeterminate time period to be so served is mandated by the statute of conviction, remand is required, in that the exercise of judicial *99 discretion is needed to tailor the sentence to the individual defendant and because a defendant is not entitled to an illegally lenient sentence. La. R.S. 15:301.1(A); State v. Williams, supra.
The sentences for attempted second degree murder are for a determinate time period, and will automatically be served without benefits.
The sentence for attempted second degree kidnapping requires judicial discretion in assessing the portion of sentence to be served without benefits. Remand is necessary for re-sentencing on this charge.

DECREE
We reverse the conviction for second degree kidnapping. We affirm the attempted second degree kidnapping conviction, but vacate the illegally-lenient sentence and hereby remand for re-sentencing. We affirm the conviction and sentence on the other six charges.
SECOND DEGREE KIDNAPPING CONVICTION REVERSED; ATTEMPTED SECOND DEGREE KIDNAPPING CONVICTION AFFIRMED, BUT SENTENCE VACATED AND REMANDED; CONVICTION AND SENTENCE ON OTHER SIX CHARGES AFFIRMED.