966 So.2d 104 (2007)
STATE of Louisiana, Appellee
v.
Kevin BOWMAN, Appellant.
No. 42,533-KA.
Court of Appeal of Louisiana, Second Circuit.
September 19, 2007.
*106 Louisiana Appellate Project, by Peggy J. Sullivan, Monroe, for Appellant.
Paul J. Carmouche, District Attorney, Lea Hall, John Ford McWilliams, Jr., Assistant District Attorneys, for Appellee.
Before BROWN, DREW and MOORE, JJ.
MOORE, J.
The defendant, Kevin Bowman, was originally charged with aggravated rape, aggravated kidnapping and simple robbery. A jury convicted Bowman of the responsive verdict of simple kidnapping but was unable to reach a verdict on the aggravated rape and simple robbery charges. The trial court sentenced Bowman to serve ten years imprisonment at hard labor for simple kidnapping, and Bowman now appeals. We affirm the defendant's conviction and sentence.

FACTS
The events that led to the charges against the defendant in this case occurred in Shreveport on the night of May 28, 2004, but the defendant and the 20-year-old female victim, E.M., were acquainted with each other long before these events. When E.M. was a 16-year-old high school student, she had a romantic relationship with the defendant, who at that time was 20 or 21 years old. That relationship ended when E.M. was in the 10th grade, but she and the defendant remained friends; the defendant was sometimes a dinner guest at E.M.'s house.
On the evening of May 28, 2004, E.M. was staying at her grandparents' house when the defendant called her and then came over. When the defendant arrived, he and E.M. visited with E.M.'s aunt for a while until E.M. decided to go to a convenience store to buy cigarettes. Sometime between 7:00 and 8:00 p.m., E.M. drove the defendant to the store; E.M. had just been paid and had approximately $100 in cash. They returned to E.M.'s grandparents' house briefly until the defendant asked E.M. to drive him to his grandmother's house.
The defendant did not testify, so the following version of events presented to the jury came solely from E.M.E.M. agreed to take the defendant to his grandmother's house; the defendant directed E.M. to drive to an address in Mooretown. E.M. said that on the drive there, the defendant twice put his hand on her leg *107 and rubbed it, but E.M. moved the defendant's hand away each time.
When they arrived at the home, the defendant got out of the car and went to the front door. The defendant tried to enter the home through both the front and side doors, but was unable to get inside; E.M. said that this made the defendant angry. E.M. testified that the defendant returned to her and then loudly demanded that she engage in oral and vaginal sex with him; E.M. refused. The defendant then told E.M. to follow him to the backyard, and E.M. complied. As they went to the back, the defendant again demanded sex from E.M., and this time the defendant said that he would hurt E.M. "real bad" if she did not comply. Unable to get into the house, the defendant walked to a trailer parked in the backyard, laid down, and ordered E.M. to perform oral sex on him. E.M. said that the defendant hit her in the face twice and grabbed her by her neck before making E.M. put the defendant's penis in her mouth.
After that, the defendant ripped E.M.'s pants in a forcible effort to take them off; E.M. said that she tried her utmost to resist but was unable to do so. The defendant pulled E.M.'s pants down and inserted his penis inside E.M.'s vagina. E.M. continued to struggle and was able to get up, but the defendant grabbed E.M.'s car keys and threw them into a nearby pasture. E.M. screamed and tried to get to her keys by climbing the fence between the yard and the pasture, but the defendant grabbed her shirt and pulled her off of the fence. The defendant then climbed over the fence first; E.M. climbed the fence behind the defendant, trying to get to her keys. The defendant reached the keys first and took them, so E.M. screamed again and tried to run to a neighboring house to get help.
In this exchange with the prosecutor, E.M. described what happened next:
Q: What happened to you because you screamed?
A: He grabbed me by my neck again.
Q: And this time it was more serious than what we've talked about?
A: Yes.
Q: Tell me what happened?
A: He grabbed my neck, I fell, that's when he grabbed my shirt and started dragging me down the street.
Q: You're being dragged down the street, you remember I asked you did your feet get hurt?
A: Yes.
Q: What happened to your feet?
A: My legs and my feet got all scratched up pretty badly.
Q: Now, as he starts dragging you down the street, what happens?
A: He drags me around to where my car was parked.
E.M. was unclear about whether the defendant was armed during this encounter. The defendant forced E.M. back to her car and then the defendant demanded E.M.'s money. When E.M. refused to surrender the money, the defendant choked E.M. so hard that she nearly fainted, reached into E.M.'s pocket and took her money. The defendant then threw down E.M.'s keys and ran away.
E.M. drove to the home of her fiancé who urged E.M. to go to the police, but E.M. did not do so because she was embarrassed about what had happened to her and frightened of possible retaliation from the defendant, who lived on the same street as her grandmother. E.M.'s fiancé testified that E.M. was scratched and bruised, that her clothes were torn and bloody and that E.M. was crying and "having *108 a fit." E.M. did not tell her fiancé that she had been raped. E.M. left her fiancé's house and went back to her grandparents' home, where she met her aunt. Her aunt observed scratches on E.M.'s neck and bruises on E.M.'s face, arms and legs. E.M. told her aunt that she had been raped and robbed.
The next morning, she went to the Shreveport Police Department ("SPD") to report the crime. E.M. reported the crime to a male officer; the male officer called in a female officer, Corporal Fontonia Davis, to examine and photograph E.M. Corporal Davis observed bruises on E.M.'s face, neck, breasts, stomach and legs, and saw abrasions on E.M.'s feet and lower legs as if E.M. had been dragged. Although pictures were taken of E.M., the pictures were misplaced and could not be found for trial. No physical evidence or "rape kit" was taken from E.M.
Further, the SPD report about E.M.'s case did not get assigned to SPD's sex crimes detective, Rita Caldwell, so the case involving E.M. was not investigated until the early part of 2005, when police were investigating a report of a similar crime made by another victim, K.H., who (according to the responding officer and the detective) also had bruise injuries to her neck. DNA evidence, taken from a "rape kit" sample from K.H., matched Bowman and was introduced at this trial relating to Bowman's conduct with E.M.
E.M. remained reluctant to speak with police due to her fear of the defendant, but early in 2005 E.M. told Det. Caldwell that the defendant had kidnapped, raped and robbed her. E.M. readily identified the defendant in a photo lineup. Police and E.M. were unable to find the location of the home where the events with E.M. took place.
The defendant did not testify. Two of the defendant's sisters testified that they took the defendant to a convenience store to meet E.M. on the night these events occurred; both women said that at the time they saw the defendant and E.M. together, there did not appear to be any problems between them.
The case went to the jury, but the jury was only able to reach a verdict on the kidnapping charge, returning a responsive verdict of guilty of simple kidnapping. The defendant filed a motion for post-verdict judgment of acquittal, which the trial court denied.
The state filed a habitual offender bill against Bowman, charging that he was a second felony offender. The court conducted a multiple offender hearing, at which time SPD Corporal Tommy Rachal testified. Corporal Rachal took the defendant's fingerprints and compared them to those on two bills of information for offenses (unauthorized use of a motor vehicle-the basis for the habitual offender bill-and illegal possession of stolen things) to which Bowman pled guilty on the same day, May 29, 2003; the fingerprints matched each other. Accordingly, the court found Bowman to be a second-felony habitual offender.
The matter returned for sentencing in September 2006, at which time the court heard testimony from both of Bowman's grandmothers; both of these women said that Bowman had been raised in church and that he never gave either of them any trouble. No pre-sentence investigation appears in this record that is related to this offense; however, there is a presentence investigation from 2002 attached to a bill of information from the 11th JDC, DeSoto Parish. In that matter, Bowman pled guilty to unauthorized use of a vehicle on January 7, 2002. Bowman, born on August 4, 1979, has at least three prior felony convictions; further, he has several juvenile *109 adjudications of delinquency including first degree robbery (pled down from armed robbery; Bowman, at age 14, used a handgun to rob a Circle K clerk), aggravated assault (on two separate occasions), and simple battery.
In sentencing Bowman to serve ten years imprisonment at hard labor, the trial judge gave an extensive review of Bowman's criminal history and related the details of the instant offense. The court also related that Bowman had apparently used at least two different aliases during his life. The court noted that Bowman has a 19-month-old son-about which his grandmothers knew nothing-and had a sporadic employment history, mainly as a dishwasher. The court found that a lesser sentence than the maximum sentence would deprecate the seriousness of the offense and noted that Bowman had not shown any remorse for his actions.
The record contains a ruling on October 20, 2006, by the trial court denying Bowman's motion to reconsider sentence which itself does not appear in the record. In denying the motion, the court restated those reasons that it gave at the sentencing hearing. Bowman now appeals, urging two assignments of error.

DISCUSSION
Assignment of Error 1. The evidence presented was not sufficient to convict Kevin Bowman of the simple kidnapping of E.M.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2 Cir. 8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied, XXXX-XXXX (La.11/9/06), 941 So.2d 35; State v. Jones, 31,613 (La.App. 2 Cir. 4/1/99), 733 So.2d 127, writ denied, 99-1185 (La.10/1/99), 748 So.2d 434. This rule is equally applicable to the testimony of victims of sexual assault. State v. Robinson, 36,147 (La.App. 2 Cir. 12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App. 2 Cir. 8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490. See also State v. Simpson, 39,268 (La.App. 2 Cir. 1/26/05), 892 So.2d 694. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. *110 State v. Robinson, supra; State v. Ponsell, supra. See also State v. Johnson, 96-0950 (La.App. 4 Cir. 8/20/97), 706 So.2d 468, writ denied, XXXX-XXXX (La.7/2/98), 724 So.2d 203, cert. denied, 525 U.S. 1152, 119 S.Ct. 1054, 143 L.Ed.2d 60 (1999).
The charged offense in this case was aggravated kidnapping, which carries a life sentence without benefit of probation, parole, or suspension of sentence. It is defined by La. R.S. 14:44 as "the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person."
Viewing the evidence in the light most favorable to the state, a reasonable juror could have concluded beyond a reasonable doubt that the elements of the offense were met in this case. Defendant persuaded E.M. to leave her grandmother's house to allegedly drive him to his grandmother's house. After they arrived at the house, he ordered her to the back yard and demanded sex from her. He threatened her if she refused to comply and actually struck her in the face. A jury could easily conclude that Bowman forcibly detained E.M. and forced her to have sex with him as well as taking her money. State v. Grubbs, 93-2559 (La.App. 4 Cir. 10/25/94), 644 So.2d 1105, writ denied, 94-2880 (La.5/5/95), 654 So.2d 323.
The jury convicted the defendant of simple kidnapping, a responsive verdict to the charged offense. A jury has the prerogative to compromise and render a lesser verdict whenever it could have convicted as charged, which it clearly could have done in this case. State ex rel Elaire v. Blackburn, 424 So.2d 246 (La.1982), cert denied, Elaire v. Blackburn, 82-6254, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); State v. Bryant, 33,078 (La.App. 2 Cir. 3/1/00), 754 So.2d 387; State v. Tatum, 27,301 (La.App. 2 Cir. 9/27/95), 661 So.2d 657.
Accordingly, this assignment is without merit.
Assignment of Error 2. The sentence of ten years hard labor-the maximum sentence  was excessive.
La. R.S. 14:45 provides, in part:
B. Whoever commits the crime of simple kidnapping shall be fined not more than five thousand dollars, imprisoned with or without hard labor for not more than five years, or both.
La. R.S. 15:529.1(A)(1)(a) makes the penalty for a second felony habitual offender not less than one half of the longest term and not more than twice the longest term for a first conviction. Bowman's ten-year sentence-twice the maximum for a first offense-is the maximum sentence.
Appellate review of sentences for alleged excessiveness is a two-pronged inquiry. First, the record must show that the sentencing court complied with La. C. Cr. P. art. 894.1. The court need not list every aggravating or mitigating factor so long as the record reflects that it adequately considered the guidelines. State v. Quiambao, 36,587 (La.App. 2 Cir. 12/11/02), 833 So.2d 1103, writ denied, XXXX-XXXX (La.5/16/03), 843 So.2d 1130. When the record shows an adequate factual basis for the sentence imposed, remand *111 is unnecessary even in the absence of full compliance with the article. State v. Lanclos, 419 So.2d 475 (La.1982). The court is not required to assign any particular weight to any specific matters at sentencing. State v. Quiambao, supra. In selecting a proper sentence, the court is not confined to evidence of prior convictions but may consider all prior criminal activity. State v. Myles, 94-0217 (La.6/3/94), 638 So.2d 218; State v. Houston, 40,642 (La.App. 2 Cir. 3/10/06), 925 So.2d 690, writ denied, XXXX-XXXX (La.10/13/06), 939 So.2d 373. The court has great discretion in imposing a sentence within the statutory limits; absent a manifest abuse of that discretion, the appellate court will not disturb a legal sentence. State v. Guzman, 99-1753 (La.5/16/00), 769 So.2d 1158.
The second prong is constitutional excessiveness. A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 92-3120 (La.9/10/93), 623 So.2d 1276; State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is deemed grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribution to acceptable penal goals. State v. Guzman, supra. Maximum sentences are reserved for the most serious violations of the charged offense and the worst kind of offender. State v. Quebedeaux, 424 So.2d 1009 (La.1982); State v. Gatti, 39,833 (La.App. 2 Cir. 10/13/05), 914 So.2d 74, writ denied, 2005-2394 (La.4/17/06), 926 So.2d 511.
In the instant case, the trial court carefully considered Bowman's criminal history  which was extensive  as well as his social and employment history. The trial court noted that the defendant had a long history of serious offenses dating back to his childhood and had only sporadically been employed. The trial court also considered the circumstances of the instant offense  which were extraordinary  and the defendant's lack of remorse. The trial court's reasons were adequate under La. C. Cr. P. art. 894.1. Moreover, there is no hint of constitutional excessiveness about the defendant's maximum sentence; this was a very violent incident that traumatized the victim and the defendant's long criminal history at a relatively young age demonstrates that he is among the worst types of offenders. This assignment of error is without merit.

CONCLUSION
For the foregoing reasons, the conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.